2018 IL App (3d) 170779

Opinion filed April 25, 2018

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2018

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of the 9th Judicial Circuit, |
| DANIELLE FATKIN, | ) | Knox County, Illinois. |
| | ) | |
|     Petitioner-Appellant, | ) | |
| | ) | Appeal No. 3-17-0779 |
|     and | ) | Circuit No. 14-D-96 |
| | ) | |
| TODD FATKIN, | ) | Honorable |
| | ) | Paul L. Mangieri, |
|     Respondent-Appellee. | ) | Judge, presiding. |

PRESIDING JUSTICE CARTER delivered the judgment of the court, with opinion.
Justice Wright concurred in the judgment and opinion.
Justice Schmidt dissented, with opinion.

**OPINION**

¶ 1    As a result of the dissolution of their marriage, the parties, Danielle Fatkin and Todd Fatkin, were awarded joint custody of their two minor children. Todd subsequently filed a postdissolution petition for leave to relocate with the minors out of the state of Illinois. The trial court granted the postdissolution petition for relocation. Danielle appealed. We reverse and remand for further proceedings.

¶ 2                                        FACTS

¶ 3        Danielle and Todd were married on August 4, 2004. They subsequently had two children—a son born in 2004 and a daughter born in 2010.

¶ 4        Prior to the birth of their daughter, Danielle and Todd moved to East Galesburg, Illinois, in August 2008, where they resided together until their separation in June 2014. The trial court entered a final order on custody and visitation on July 16, 2015, and subsequently entered a dissolution of marriage judgment on June 10, 2016. Danielle and Todd were awarded joint custody of the minors, with "primary physical placement" with Todd. The parties were ordered to consult with each other in making significant decisions regarding the children related to medical, educational, religious, and extracurricular activities, with Todd designated as the parent to make decisions for the children if the parties were not able to come to a timely agreement. Danielle was given parenting time of overnight visits of 6 out of every 14 days (every Monday and Tuesday night and every other Saturday and Sunday night), plus time after school on Wednesdays, Thursdays, and Fridays until Todd got off of work. The parties were to alternate one-week periods of parenting time during summer break.

¶ 5        On February 10, 2017, Todd filed a notice of his intent to relocate with the children to live with his parents in Virginia Beach, Virginia. Danielle filed an objection to the relocation. On June 5, 2017, Todd filed a petition for leave to relocate with the minors to Virginia Beach pursuant to section 609.2 of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/609.2 (West 2016)).

¶ 6        Over the course of a three-day hearing on Todd's petition to relocate, both parties testified and presented evidence and the trial court conducted an *in camera* interview with the parties' 12-year-old son. The parties' daughter was six years old at the time of the hearing and did not participate in the proceedings.

¶ 7     The evidence showed that Todd was 48 years old and rented the home where the parties formerly lived together during their marriage in East Galesburg, Knox County, Illinois. Todd had a Bachelor of Arts degree in fine arts and a dental hygienist associate's degree. He was licensed as a dental hygienist in both Virginia and Illinois. He also had a Montessori teaching certificate. From 2011 to 2015, Todd worked for a dental practice in Peoria, Illinois, earning $50,000 per year. Todd quit working for Aspen Dental because he had a job offer from a dentist's office in Moline, Illinois, making more money and he had "some major issues" with the ethics of the Peoria dental practice.

¶ 8     In late 2015, after working at the dentist office in Moline for four months, Todd's employment was terminated. Todd was subsequently denied unemployment benefits because he had been terminated due to misconduct. Todd applied to three local dentist offices near his home. He would not apply for dental jobs in bigger cities (*i.e.*, Peoria or the Quad Cities) because the commute would be over an hour and that was "not the quality of life" that he wanted. He did not want his kids "not to be able to see [him]" if he undertook that kind of a commute.

¶ 9     In April 2016, Todd began employment with City of Galesburg as a community service officer to enforce city ordinances for up to 1000 hours per year, at the rate of $12.00 per hour, with no benefits, for an annual income of $12,000 per year. Todd worked from April 2016 until the 1000 hours of work was exhausted in late October or early November. Todd applied for and received unemployment compensation from November until the start of the next employment cycle in April. He also received $508 per month in child support from Danielle ($6096 per year).

¶ 10     Danielle was 41 years old and lived within two miles of Todd's residence in a home that she had purchased. Danielle was employed as a tenure track professor of history and worked during the academic year from 8:30 a.m. until 2:30 p.m. She was under contract until 2020 with

her current employer, and she did not intend to leave the area. Danielle regularly exercised her parenting time. Danielle had been the soccer coach for both children (for the parties' son for one season and the parties' daughter for one season), volunteered in their classrooms, had been the room mother for the children's classes, and was the group leader for the parties' daughter's 4-H club group. Danielle was primarily responsible for scheduling the children's medical appointments, with Todd also involved. Danielle volunteered weekly in the classroom of the parties' daughter, attended parent-teacher conferences, and kept in regular contact with the children's teachers. She also provided enrichment activities related to archeology to share her expertise in her field of work at the children's school. Danielle and her children enjoyed doing many activities together, such as baking, running, biking, hiking, camping, taking road trips, reading, and horseback riding.

¶ 11        For the 2016-17 school year, Danielle had seen the children every day after school until spring 2017 when Todd told the parties' 12-year-old son that he was allowed to go directly home after school on Wednesdays, Thursdays, and Fridays because his son wanted to go home instead of going with Danielle. Todd told Danielle not to pick up their son on those days. Todd testified that he also placed their daughter in an after-school day care program on those days because she did not want to go Danielle's home after school. Danielle testified that for the 2017-18 school year, Danielle's teaching schedule changed so she could no longer get her daughter from school on Wednesdays or Fridays, but she still picked her daughter up on Thursdays until Todd got home from work. Danielle felt that her son would be better off spending the time with her after school on Todd's overnight weekdays because she wanted to spend time with him, he seemed too young to be by himself after school, and his grades were beginning to decline. In the 2016-17 academic year, the parties' son was getting Bs, Cs, and Ds, and in the current year of 2017-18 he

4

received a B, a D, and two Fs on his midterm report card. The parties' son had expressed concerns to Danielle about being bullied in school where he had been called names ("girl" and "Jew") and was shamed for not playing football.

¶ 12      The children were both involved in extracurricular activities. The parties' son was currently in soccer, jazz band, and the 4-H club. The parties' daughter was in gymnastics, soccer, and the 4-H club. Both children had many close friends in the area.

¶ 13      Todd wanted to relocate with the children to live in his parents' home in Virginia Beach. Todd had been raised in Virginia Beach until he and his parents had moved during his last year of high school. Todd's parents, who were in their mid-sixties, had returned to live in Virginia Beach some years prior. Todd's father was in good health, but his mother had stage 5 renal failure and was on a waitlist to receive a kidney transplant. If she did not receive a kidney, Todd did not know how much longer she would live. Todd testified that he and the children would live with his parents in their four or five bedroom home, which was "meticulously kept" by his mother. Todd's parents would not require Todd to pay rent and his day care arrangement for the children would be his parents, although his mother was not in good health and his father had to recently returned to work to pay for his mother's medication. Todd also testified that he had childhood friends in Virginia Beach that he could call if he needed someone to watch the children. One of the reasons Todd wanted to relocate to Virginia was because his mother was not in good health and they did not know how much longer she had to live.

¶ 14      Todd testified that he was familiar with the schools in Virginia Beach. Todd explained the school system in Virginia Beach was "a way better school system" with extracurricular activities that are "enormous" compared to those in Knox County, Illinois. Todd explained the teen sports activities offered in Virginia Beach were "far, far greater" and the children would

5

have "much, much better opportunities within the education." Todd testified to the names of the schools in Virginia Beach the children would attend. Todd testified that the school system in Virginia Beach was "enormously diverse" and the lack of diversity was one of the things that "saddened" him about the children's school system in Illinois. Todd testified that the band program in Virginia Beach was "top notch" and better than the band program at the children's school in Illinois. He indicated the East Coast Surfing Championships held in Virginia Beach was one of his own childhood "go-tos," which he had surfed in as a child, from the third grade through high school. He explained that, if there was a multi-day festival, there were activities every single day, with free concerts from live bands that were not "rinky-dink bands" but, rather, bands like Metallica and big-named bands. Virginia Beach also had art, theatre, and a marine science center.

¶ 15    Todd served in the Coast Guard for four years after high school. He testified that he was rated with the United States Department of Veterans Affairs (VA) to have full medical care. He testified that due to where he resided in Illinois, he could go to a VA clinic for blood work and physicals but for anything more extensive he would have to travel to Iowa City, Iowa. Todd testified the healthcare available to him through the VA in Virginia Beach would be better and more accessible than in Knox County, Illinois.

¶ 16    Todd further testified that he would immediately be employed upon his arrival in Virginia Beach. Todd produced an undated letter of intent to hire from the store manager of a retail store in Virginia Beach. The store manager indicated in the letter, "[p]ay rate is hourly in the range of $9.50-$16.50 and all employees gain benefits with a rolling average of 20 hours per week." Todd testified that he would begin working as a sales associate, and he believed that he would be able to easily move into a supervisory position making $20 per hour because he had prior

6

experience with the company at another location. (A resume of Todd's submitted into evidence indicated that Todd had worked for the same retail company in California from 1998 to 2007.) Upon moving to Virginia Beach, Todd intended to work full-time as a retail associate and also to look for dental hygienist positions.

¶ 17        Todd testified that he wanted to move to Virginia Beach to provide the children with a better quality of life, higher standard of living, and good educational opportunities. Todd testified the only extended family he had in Virginia Beach were his parents. Todd did not have any extended family in Knox County, Illinois. Todd had not been to Virginia Beach since June of 2014 (three years), and the parties' children had not been to Virginia Beach since 2013 (over four years) when they had visited at the ages of nine and three. The children had not seen Todd's mother since 2014 when she came to Illinois for a visit (three years prior). The children had not seen Todd's father since the last time they were in Virginia Beach in 2013 (for over four years).

¶ 18        On November 13, 2017, the trial court entered a written order granting Todd's petition for leave to relocate. The trial court found that Todd's parents were "financially secure"; Todd would live in his parents' home rent free; residing with Todd's parents would provide "a sense of extended family" and "a support system" that was not present in Illinois; Virginia Beach was an affluent and diverse area, with concerts and festivals that "would not be available to the children in their present location"; employment opportunities for Todd in Virginia Beach were "abundant"; assuming a pay rate of $13.00 per hour, Todd would make $13,520 per year working at least 20 hours per week with the opportunity to gain benefits at the retail store and it could be inferred that there would be "a fair demand" for dental hygienists in the Virginia Beach area, with 400,000 inhabitants, that would pay "at least equal to if not more" than what Todd earned when employed in Illinois as a dental hygienist earning $50,000 per year; Todd would

receive more advanced VA medical care without having to drive two hours and the VA care that would be available 20 miles from Virginia Beach in Norfolk, Virginia, was "certainly more comprehensive than that offered in Todd's present location and minutes away as compared to hours"; there appeared to be available and adequate medical care for the children in both their current Illinois location and in Virginia Beach; based upon Todd's experience from growing up in Virginia Beach and his research, Todd had testified that the Virginia Beach schools were "far more multicultural and ethically diverse," and the trial court found him "credible and accurate" but acknowledged the lack of objective evidence to allow for a qualitative assessment; the bullying that the parties' son experienced at school was of a racial, religious, or machismo nature, which "is always based upon ignorance and almost always the product of a community that lacks cultural or racial diversity" and in that respect the Virginia Beach school district "would appear to be superior to that of children's current district"; Danielle's relationship with the parties' daughter was good and her relationship with the parties' son was "strained and somewhat tenuous," with both children preferring not to go to their mother's home after school; the parties' son loved both parents but viewed Todd as the more caring, understanding, and nurturing parent and found Danielle confusing, arbitrary, and withdrawn; the parties' son stated his preference in favor of relocating to Virginia Beach; and the parties' son would not be significantly impacted by the relocation, while for the parties' daughter "the impact may be more manifest, as it appear[ed] from the testimony that [she] has a stronger bond with her mother."

¶ 19     The trial court found that it would be able to fashion a reasonable allocation of parental responsibilities in granting the relocation, finding "no need to vary or alter the current division of parental responsibilities as it now stands." The trial court acknowledged that by dividing parenting time along the lines of summer and holiday time, there would be a "*de facto*"

8

allocation of "day to day parental responsibilities among the parties" with each parent essentially solely responsible for the day-to-day oversight of the children when they were in the respective parent's care, with the parties consulting in regard to significant decisions related to medical, educational, religious, and extracurricular activities

¶ 20        The trial court also found that the discrepancy between the testimony of the parties' son and Danielle regarding whether the parties' son had heard Danielle on more than one occasion discussing the possibility of relocating to Tennessee where her boyfriend resided was troubling. The trial court indicated that the parties' son appeared credible, Danielle had not absolutely denied having the conversations about relocating to Tennessee, and Danielle's contemplation of a relocation created "the existence of a possible double standard on the part of Danielle relative to her opposition to [Todd's] relocation."

¶ 21        The trial court found that it was in the best interest of the children to grant the relocation. The trial court modified the parties' parenting time so that the children would reside with Todd for the school year, from a week before school started until a week after school ended, and then they would reside with Danielle for the remaining weeks of the summer. Danielle would also have the children every other Thanksgiving break (odd years), every other spring break (odd years), and a portion of every winter break.

¶ 22        The trial court noted that granting the petition for relocation raised issues of reasonable costs of transportation and altered the number of nights each parent would have the children so that a modification of child support would have to be addressed. The trial court indicated that because it did not have specific information concerning the economic circumstances of the parties, it was reserving its ruling on issues of allocation of transportation costs and modification of child support.

¶ 23    On November 16, 2017, Danielle filed a notice of appeal from the trial court's order of November 13, 2017. In the notice of appeal, Danielle requested that this court reverse the order granting Todd's petition for leave to relocate.

¶ 24    ANALYSIS

¶ 25    I. Appellate Jurisdiction

¶ 26    On appeal, Todd initially argues that this court lacks jurisdiction to hear Danielle's appeal from the trial court's order granting him leave to relocate to Virginia Beach because issues of transportation costs and modification child support were reserved and remained pending in the trial court. Danielle contends that the relocation order in this case constituted a modification of parental responsibilities that could be appealed under Illinois Supreme Court Rule 304(b)(6) (eff. Mar. 8, 2016). The issue of this court's jurisdiction is a legal question that we determine *de novo*. *In re Marriage of Teymour*, 2017 IL App (1st) 161091, ¶ 10.

¶ 27    Generally, where an order appealed from resolves less than all claims, a finding pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) is required. Rule 304(a) provides, "[i]f multiple parties or multiple claims for relief are involved in an action, an appeal may be taken from a final judgment as to one or more but fewer than all of the parties or claims only if the trial court has made an express written finding that there is no just reason for delaying either enforcement or appeal or both." *Id.* Absent a Rule 304(a) finding, a final order disposing of fewer than all of the claims is not an appealable order and does not become appealable until all of the claims are resolved unless an appeal is provided for elsewhere under the supreme court rules. *In re Marriage of Gutman*, 232 Ill. 2d 145, 151 (2008).

¶ 28    Rule 304(b)(6) provides that a custody order entered within a dissolution proceeding is a final appealable order without regard to the pendency of remaining issues. *In re Marriage of*

10

*Harris*, 2015 IL App (2d) 140616, ¶ 16. Rule 304(b)(6) allows for the immediate appeal of a "custody or allocation of parental responsibilities judgment or modification of such judgment" without a Rule 304(a) finding. Ill. S. Ct. R. 304(b)(6) (eff. Mar. 8, 2016). The committee comments to Rule 304(b) state:

> "The intent behind the addition of subparagraph (b)(6) was to supercede the supreme court's decision in *In re Marriage of Leopando*, 96 Ill. 2d 114, 119 (1983). In *Leopando*, the court held that the dissolution of marriage comprises a single, indivisible claim and that, therefore, a child custody determination cannot be severed from the rest of the dissolution of the marriage and appealed on its own under Rule 304(a). Now, a child custody judgment, even when it is entered prior to the resolution of other matters involved in the dissolution proceeding such as property distribution and support, shall be treated as a distinct claim and shall be appealable without a special finding. *** The goal of this amendment is to promote stability for affected families by providing a means to obtain swifter resolution of child custody matters." Ill. S. Ct. R. 304(b), Committee Comments (adopted Feb. 26, 2010).

¶ 29    The language of Rule 304(b)(6) does not specifically reference relocation judgments but, rather, references custody judgments/judgments allocating parental responsibilities and the modification of such judgments as being appealable despite other issues that remain pending in the trial court. In *In re Parentage of Rogan M.*, 2014 IL App (1st) 132765, ¶¶ 22-23, the First District of the Illinois Appellate Court held that an order denying a mother's postdissolution petition to relocate was not a "custody judgment" or a modification of custody as contemplated by Rule 304(b)(6). In addition, in *In re Marriage of Bednar*, 146 Ill. App. 3d 704, 708 (1986), a

11

mother appealed the denial of her motion to dismiss the father's removal petition, contending the removal petition constituted a petition to modify custody where the parties had joint custody, and the First District appellate court held that a removal is not a petition to modify custody as a matter of law, even when the parties had been awarded joint custody.

¶ 30    In this case, Danielle appealed the order allowing Todd's postdissolution petition for leave to relocate while the issues of modification of child support and allocation of transportation costs were reserved by the trial court. The effect of the order entered by the trial court allowing the removal was a *de facto* modification of the parties' joint custody award. Under the original custody order, Danielle had joint parental decision making responsibilities on every major parenting issue, the children lived with Danielle 6 of 14 days, and Danielle was additionally allowed to see the children after school on the remaining days of the school week until Todd got home from work. Danielle lived two miles from the children, allowing her to be involved with the children on an almost daily basis and facilitating her ability to execute joint decision making responsibilities. Under the relocation order, Danielle would see the children for approximately one-third of the year, as opposed to almost every day of the year, with her allotted parenting time largely limited to the summer. To say that, in reality, Danielle would retain any meaningful decision-making responsibilities about the children's education, extracurricular activities, healthcare, or religion during the school year or that Todd would have a say in whether the children were involved in educational, extracurricular, or religious activities during Danielle's summer parenting time would be a fallacy.

¶ 31    This case is distinguishable from *Rogan* and *Bednar* because those cases dealt with the parties' filings related to a request for a potential relocation, whereas a relocation order entered by the trial court in this case that, in effect, modified the prior judgment allocating parental

12

responsibilities. See *Rogan M.*, 2014 IL App (1st) 132765; *Bednar*, 146 Ill. App. 3d 704. While not all relocation orders may constitute a modification of a joint custody order, the relocation order entered in this case modified the judgment awarding the parties' joint parenting responsibilities to such an extent that we view it as a modification of the prior order allocating parental responsibilities and, therefore, it falls within the scope Rule 304(b)(6). As such, we have jurisdiction under Rule 304(b)(6) over Danielle's appeal from the relocation order entered in this case.

¶ 32                                          II. Relocation

¶ 33        On appeal, Danielle argues that the trial court erred in granting Todd's petition for leave to relocate with the minor children from Illinois to Virginia Beach, Virginia. Pursuant to section 609.2(g) of the Marriage Act, the trial court "shall modify the parenting plan or allocation judgment in accordance with the child's best interests" by considering the following 11 factors:

> "(1) the circumstances and reasons for the intended relocation;
>
> (2) the reasons, if any, why a parent is objecting to the intended relocation;
>
> (3) the history and quality of each parent's relationship with the child and specifically whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him or her under the parenting plan or allocation judgment;
>
> (4) the educational opportunities for the child at the existing location and at the proposed new location;
>
> (5) the presence or absence of extended family at the existing location and at the proposed new location;
>
> (6) the anticipated impact of the relocation on the child;

13

(7) whether the court will be able to fashion a reasonable allocation of parental responsibilities between all parents if the relocation occurs;

(8) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to relocation;

(9) possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the child;

(10) minimization of the impairment to a parent-child relationship caused by a parent's relocation; and

(11) any other relevant factors bearing on the child's best interests." 750 ILCS 5/609.2 (West 2016).

¶ 34        The parent seeking relocation has the burden of proving, by a preponderance of the evidence, that relocation would be in the child's best interest. *In re Parentage of P.D.*, 2017 IL App (2d) 170355, ¶ 15. The paramount question in any removal case is whether the move is in the best interest of the child. *In re Marriage of Eckert*, 119 Ill. 2d 316, 325 (1988). Our supreme court has held a "determination of the best interests of the child cannot be reduced to a simple bright-line test, but rather must be made on a case-by-case basis, depending, to a great extent, upon the circumstances of each case." *Id.* at 326. A trial court's determination of what is in the best interests of the child should not be reversed unless it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred. *Id.* at 328. There is a "strong and compelling" presumption in favor of the result reached by the trial court because the trial court had the opportunity to observe the parties and assess and evaluate their temperaments, personalities, and capabilities. (Internal quotation marks omitted.) *Id.* at 330.

14

¶ 35    Here, the trial court considered each factor set forth in section 609.2 of the Act. The evidence showed that Todd wanted to move to Virginia to enhance the quality of life of the children and provide them with a better standard of living. As for Todd's employment, the evidence showed that Todd was voluntarily underemployed in Illinois. While Todd was offered a $9.50 to $16.50 per hour retail job in Virginia Beach at some point (the letter entered into evidence was not dated), there was no indication of how many hours he would be given or his actual starting pay. There was also no evidence as to the lack of similar retail jobs in Illinois that would necessitate relocating the minors to Virginia Beach for Todd to take this particular. There was also no evidence regarding opportunities for Todd in Virginia Beach in regard to working as a dental hygienist. Todd had been terminated from his position as a dental hygienist, and he had not been offered a dental hygienist position since, in Virginia or Illinois. There was no evidence of any prospective dental hygienist positions in Virginia Beach. Todd also testified that he was trained and had experience as a Montessori teacher but there were no local Montessori schools where he could teach in Illinois. There was no indication that he sought out employment in Illinois as a teacher in any educational setting. As for the children's education, the trial court acknowledged, Todd provided no qualitative evidence regarding his claim that the schools in Virginia Beach were superior.

¶ 36    If they relocated, the children would have the extended family of their two grandparents in Virginia Beach, whereas they have no extended family in Illinois. However, the reality is that the children would be relocating away from their longtime friends, their childhood home, and their mother, who provides at least 44% of their care, in order to move into a home that belongs to their paternal grandparents, who they have not seen in many years and who are expected to

15

provide them with day care when Todd is at work, despite the grandmother's failing health and the grandfather having recently returned to work.

¶ 37 Both Todd and Danielle have exercised their respective parental responsibilities and parenting time, and neither of them had substantially failed or refused to exercise their allotted parental responsibilities under the allocation of parental responsibilities judgment. Danielle has been heavily involved in her children's activities and schooling. Given the distance and the long gaps between her parenting time, Danielle's influence and involvement in parental decision making during the school year would greatly be diminished or nonexistent under the relocation order.

¶ 38 Based on this record, the trial court's finding that the relocation was in the best interest of the children was against the manifest weight of the evidence. Therefore, we reverse the trial court's order granting Todd's petition for leave to relocate with the minors and remand for further proceedings.

¶ 39                                                      CONCLUSION

¶ 40 For the foregoing reasons, we reverse the judgment of the circuit court of Knox County and remand for further proceedings.

¶ 41 Reversed and remanded.

¶ 42 JUSTICE SCHMIDT, dissenting:

¶ 43 I dissent from both of the majority's holdings. First, we do not have jurisdiction to review this case. The majority cites no case that holds otherwise. Despite the majority's attempt to distinguish this case from *Rogan* and *Bendar* (*supra* ¶ 31), the facts are virtually the same. I believe the holdings in *Rogan* and *Bendar* are correct and apply here. The mother's difficulty in

16

exercising her joint custody rights is a factor that the trial court considered in granting the relocation request; it does not affect this court's jurisdiction under Rule 304(b)(6).

¶ 44        Even if we had jurisdiction, the record does not support the majority's determination. The majority sidesteps our standard review by improperly reweighing the evidence. See *supra* ¶¶ 35-38. As the majority recognizes, we give substantial deference to the trial court's determination and do not overturn it absent a "manifest injustice." *Supra* ¶ 34. This is so because the trial court observes the parties and witnesses firsthand throughout the case; this court does not. This record is devoid of any inkling that a manifest injustice occurred. I would affirm the trial court's judgment.