# Illinois Official Reports

## Supreme Court

---

### *In re Marriage of Fatkin*, 2019 IL 123602

---

| | |
|---|---|
| Caption in Supreme Court: | *In re* MARRIAGE OF DANIELLE FATKIN, Appellee, and TODD FATKIN, Appellant. |
| Docket No. | 123602 |
| Filed | January 25, 2019 |
| Decision Under Review | Appeal from the Appellate Court for the Third District; heard in that court on appeal from the Circuit Court of Knox County, the Hon. Paul L. Mangieri, Judge, presiding. |
| Judgment | Appellate court judgment reversed. Circuit court judgment affirmed. Cause remanded. |
| Counsel on Appeal | Daniel S. Alcorn, of Alcorn Nelson LLC, of Galesburg, for appellant. |
| | Daniel M. Cordis, of Cordis & Cordis, of Princeville, for appellee. |
| | Michael G. DiDomenico, of Lake Toback DiDomenico, and Paul L. Feinstein, of Paul L. Feinstein, Ltd., both of Chicago, *amici curiae*. |

Justices          JUSTICE THOMAS delivered the judgment of the court, with opinion.

Chief Justice Karmeier and Justices Kilbride, Garman, Burke, Theis, and Neville concurred in the judgment and opinion.

**OPINION**

¶ 1       There are two issues in this appeal: (1) whether the trial court properly granted respondent Todd Fatkin's petition to relocate out of state with the parties' minor children and (2) whether the trial court's order granting that petition was appealable immediately under Illinois Supreme Court Rule 304(b)(6) (eff. Mar. 8, 2016). After first concluding that immediate appeal was proper under Rule 304(b)(6), the appellate court below determined that the trial court's decision granting Todd's petition was against the manifest weight of the evidence. 2018 IL App (3d) 170779. It therefore reversed that decision and remanded the cause for further proceedings. For the reasons that follow, we agree with the appellate court's conclusion that this is a proper Rule 304(b)(6) appeal, but we disagree with its conclusion that the trial court's decision was against the manifest weight of the evidence.

¶ 2                           BACKGROUND

¶ 3       Todd Fatkin and Danielle Fatkin were married on August 4, 2004. They subsequently had two children together, a son born in 2004 and a daughter born in 2010. In 2008, the parties moved to East Galesburg, Illinois, where they continued to live together until their separation in June 2014.

¶ 4       In July 2015, the circuit court of Knox County entered a final order on custody and visitation, followed by a dissolution of marriage judgment in July 2016. Danielle and Todd were awarded joint custody of the children, with primary physical custody going to Todd. This meant that, while school was in session, the children spent 6 out of every 14 nights with Danielle, as well as most weekday afternoons until Todd came home from work. When school was not in session, the children spent alternate weeks with each parent. The parties were ordered to consult with each other on all significant decisions about the children, with Todd having final decision-making power if they could not agree.

¶ 5       In February 2017, Todd filed a notice of intent to relocate with the children to Virginia Beach, Virginia, where he and the children would live with Todd's parents. Danielle objected to the relocation, so Todd filed a petition for leave to relocate with minors, as required by section 609.2(f) of the Illinois Marriage and Dissolution of Marriage Act (the Marriage Act) (750 ILCS 5/609.2(f) (West 2016)).

¶ 6       The trial court conducted a three-day hearing on Todd's petition to relocate, and both parties presented evidence and testimony. In addition, the trial court conducted an *in camera* interview with the parties' son, who was then 12 years old. The trial court did not include the parties' daughter in the proceedings, as she was only six years old at the time.

¶ 7       The evidence showed that Todd was 48 years old and rented the home in East Galesburg where he and Danielle had lived during the marriage. Todd has a bachelor of arts degree in

fine arts and a dental hygienist associate's degree, and he is a licensed dental hygienist in both Illinois and Virginia. He also has a Montessori teaching certificate. From 2011 to 2015, Todd worked for a dental practice in Peoria, earning $50,000 per year. Todd quit working for the Peoria practice after receiving a job offer from a dentist's office in Moline, making more money. Todd also testified that he had concerns about the Peoria practice's business ethics.

¶ 8    In late 2015, after working at the Moline dental practice for four months, Todd's employment was terminated. Todd was subsequently denied unemployment benefits because he had been terminated due to misconduct. Todd applied to three local dentist offices near his home, but he was not hired. Todd testified that he would not apply for dental jobs in bigger cities (*e.g.*, Peoria or the Quad Cities) because the commute would be over an hour and he did not want to "spend the rest of my life commuting *** an hour and twenty some odd minutes door to door and losing all that time with my children."

¶ 9    In April 2016, Todd began working for the City of Galesburg (City) as a community service officer, earning $12 per hour. The City allows Todd to work 1000 hours per year, which means Todd works only from April through October. When he is not working for the City, Todd receives unemployment compensation. Todd also receives $508 in monthly child support from Danielle.

¶ 10    Danielle testified that she is 41 years old and lives within two miles of Todd's residence in a home that she had purchased. Danielle is employed as a tenure-track professor of history at Knox College. The term of Danielle's contract with Knox College is through 2020, and if she is not granted tenure in 2019, she will no longer be employed there. Danielle testified that she has not considered any plans for that contingency, as she anticipates being granted tenure.

¶ 11    Danielle regularly exercises her parenting time. She is primarily responsible for scheduling the children's medical appointments, with Todd also involved. She has been the soccer coach for both children, volunteered in their classrooms, served as room mother for the children's classes, and was the group leader for her daughter's 4-H club. Danielle also regularly attends parent-teacher conferences, and she keeps in regular contact with the children's teachers. She also provides enrichment activities at the children's school relating to archaeology, which is her academic field of expertise. Danielle and her children enjoy doing many activities together, such as baking, running, biking, hiking, camping, taking road trips, reading, and horseback riding.

¶ 12    Danielle further testified that she is currently in a relationship with a man who lives in Knoxville, Tennessee, and who teaches history at the University of Tennessee. She has visited him in Tennessee a few times, and he has visited her in Illinois several times. Danielle denied that she has been searching for employment in Tennessee, and she denied ever having discussed with her boyfriend or with her children that she is considering relocating to Tennessee.

¶ 13    Both children attend public schools in Knoxville, Illinois, and are involved in a variety of extracurricular activities. At the time of the hearing, the parties' son was involved in soccer, jazz band, and the 4-H club, and the parties' daughter was involved in gymnastics, soccer, and the 4-H club. Both children have many close friends in the area. Academically, the parties' daughter is doing very well. Their son's grades, however, are declining, and he has reported being bullied at school.

¶ 14        As for why he wants to relocate, Todd testified that he grew up in Virginia Beach and that his parents still live there. In addition, Todd and Danielle had lived together in Virginia Beach with their son for 10 months in 2007-08. Todd produced a letter from Recreation Equipment, Inc. (REI), stating that he would have a part-time retail sales job waiting for him in Virginia paying an hourly wage of between $9.50 and $16.50. Todd also hoped to work part time as a dental hygienist in Virginia, though he admitted that he did not have any offers or interviews lined up in that field. Todd testified that his father is in good health and in his mid-sixties but Todd's mother is in stage 5 renal failure and on a waiting list to receive a kidney transplant. If she did not receive a kidney, Todd did not know how much longer she would live. Once in Virginia, Todd and the children would live with Todd's mother and father in their five-bedroom home without having to pay rent. Todd's parents are financially secure, and they would be available to watch the children for Todd when he was not at home. Though Todd testified that the children were "very" familiar with the Virginia Beach area, in fact they had not been to Virginia Beach in almost four years. Moreover, the children had not seen Todd's mother in three years and had not seen Todd's father in over four years.

¶ 15        Todd also explained that he had served in the Coast Guard for four years after high school and that he is rated with the United States Department of Veterans Affairs (VA) to have full medical care. In the Galesburg area, however, the only available VA facility is a clinic that provides only basic services such as blood work and physicals. For anything more extensive, Todd has to travel to Iowa City. By contrast, Virginia Beach is a military community, and consequently the available VA healthcare options would be much more extensive and accessible.

¶ 16        Todd testified that the children's general quality of life and standard of living will be improved with a move to Virginia Beach because there will be better educational and extracurricular opportunities for the children there, the medical and hospital facilities in Virginia Beach are superior to those in the Galesburg area, and the children will benefit from living with and having regular contact with their grandparents. Todd stated that he is familiar with the Virginia Beach school system and knows it to be superior to the Galesburg system in terms of both academics and extracurricular activities. Todd described the Virginia Beach area as being more culturally diverse than the Galesburg area, and he believes that Virginia Beach would offer the children a much broader range of cultural opportunities.

¶ 17        During his *in camera* testimony, the parties' son stated that he thought moving to Virginia was a "great idea" because Virginia Beach would offer better educational, extracurricular, and cultural opportunities. He also stated that "this might sound sad, but I think I might be able to live without my mom." When asked why this was the case, he stated, "I kind of like don't understand her lifestyle and don't really like it." The parties' son also stated that he didn't understand why Danielle was trying to keep him and his sister in Illinois because "my mom talks about [us] moving with her to move closer to her boyfriend who lives in Knoxville, Tennessee. *** I've heard her talking to him because he's been over recently to her house, and she's talked personally to me about it."

¶ 18        At the conclusion of the hearing, the trial court entered a 13-page, single-spaced order granting Todd's petition to relocate. In the order, the trial court makes a point to acknowledge that:

> "[r]emoval cases are difficult. This is especially so when neither parent demonstrates bad faith and both have assiduously exercised their parental responsibilities and parenting time. No matter the outcome, one party's life will be affected detrimentally."

The order begins with 20 paragraphs detailing the trial court's factual findings, which largely track the factual summary set forth above. From there, the order sets forth the 11 statutory factors that a court is to consider when deciding whether relocation is in a child's best interest. See 750 ILCS 5/609.2(g) (West 2016). Finally, the order contains an additional 11 paragraphs applying the trial court's factual findings to the 11 statutory factors.

¶ 19 Broadly speaking, the trial court found that both Todd and Danielle are loving parents who are intimately involved in the children's daily lives; that Danielle's opposition to the relocation comes from a good-faith fear that relocation will diminish her relationship with her children; that Todd's desire to relocate comes from a good-faith desire to give the children more and better educational, extracurricular, and cultural opportunities and to give them a better quality of life; that the children in fact will enjoy greater educational, extracurricular, and cultural opportunities if they relocate to Virginia; that the children will benefit from living with their paternal grandparents in Virginia; and that a reasonable allocation of parental responsibilities can be fashioned to ensure that Danielle continues to spend significant time and enjoy a full relationship with the children. The trial court also found that, whereas Todd's relationship with both children is "exceptional," Danielle's relationship with their daughter is "good" and with their son "strained and somewhat tenuous." The order also notes that, whereas the relocation may be difficult for the parties' daughter because she "has a stronger bond with her mother than [her brother] does," the parties' son "clearly stated his preference for the granting of the petition for relocation and did so as an extremely articulate, mature 13-year-old who expressed reasoned and independent preferences as to relocation." Finally, the trial court made a specific credibility finding as to Danielle's denial of ever having discussed with either her boyfriend or with the children that she is considering moving to Tennessee. Noting that the parties' son had testified to the opposite, the trial court found:

> "This discrepancy between [the son's] testimony and Danielle's is troubling to the Court and resolution of it turns upon an assessment of the credibility of the witnesses. Granted [the son] was not subject to cross examination during his interview. However, the Court had the opportunity to directly observe the demeanor of both [the son] and Danielle while testifying. The Court finds that [the son] appeared to be inherently honest and credible in his report. The Court does not believe that [the son] was simply making up hearing his mother have such discussions. Moreover, Danielle's testimony proffered to rebut [the son's] statement (that he had heard her on more than one occasion discuss the possibility of her relocating to Knoxville, Tennessee,) was not an absolute denial of any discussions with anyone, but rather perhaps a factual accurate statement that she not had any conversation on that topic specifically and directly with [the son]. The impact of all of this is that [it] tends to create the existence of a possible double standard on the part of Danielle relative to her opposition to relocation."

¶ 20 In the end, "after taking all of the above into consideration," the trial court concluded that "the quality of life to [the children] will be increased by the allowing of relocation and the Court finds that the granting of the removal petition is in the best interest of the children."

Accordingly, the court stated that "a proper allocation of parenting time needs to be established" and that "it is in the best interests of [the children] that upon relocation the parenting of the parties be modified" so that the children would live with Todd in Virginia during the school year and with Danielle in Illinois over the summer and during alternating holiday breaks. The trial court specifically reserved ruling on whether to modify child support and how to allocate the resulting transportation expenses.

¶ 21 Citing Rule 304(b)(6), Danielle filed an immediate notice of appeal from the trial court's order granting Todd's petition to relocate. After first concluding that the filing of an immediate appeal under Rule 304(b)(6) was proper (2018 IL App (3d) 170779, ¶ 31), the appellate court majority concluded that "the trial court's finding that relocation was in the best interest of the children was against the manifest weight of the evidence" (*id.* ¶ 38). Accordingly, it reversed the trial court's decision granting that petition and remanded the cause for further proceedings. *Id.* Justice Schmidt dissented, arguing both that the order granting Todd's petition was not immediately appealable under Rule 304(b)(6) and that the majority was wrong in concluding that the trial court's decision granting that petition was against the manifest weight of the evidence. *Id.* ¶¶ 43-44 (Schmidt, J., dissenting).

¶ 22 Todd petitioned this court for leave to appeal, and we allowed that petition. Ill. S. Ct. R. 315 (eff. Apr. 1, 2018).

¶ 23 ANALYSIS

¶ 24 I. Jurisdiction

¶ 25 The first question we must decide is whether this is a proper appeal under Rule 304(b)(6). Like the construction of a statute, the construction of this court's rules is a question of law that we review *de novo*. *Robidoux v. Oliphant*, 201 Ill. 2d 324, 332 (2002).

¶ 26 The Illinois Constitution confers on the appellate court the jurisdiction to hear appeals from all final judgments entered in the circuit court. See Ill. Const. 1970, art. VI, § 6 (providing that appeals "from final judgments of a Circuit Court are a matter of right to the Appellate Court"). The constitution also grants this court the right to "provide by rule for appeals to the Appellate Court from other than final judgments." *Id.* Accordingly, absent a supreme court rule, the appellate court is without jurisdiction to review judgments, orders, or decrees that are not final. *EMC Mortgage Corp. v. Kemp*, 2012 IL 113419, ¶ 9.

¶ 27 Danielle filed her notice of appeal to the appellate court pursuant to Rule 304(b)(6). Rule 304(b)(6) allows for the immediate appeal from any "custody or allocation of parental responsibilities judgment or modification of such judgment entered pursuant to the Illinois Marriage and Dissolution of Marriage Act [citation] or Illinois Parentage Act of 2015 [citation]." Ill. S. Ct. R. 304(b)(6) (eff. Mar. 8, 2016). The question for this court, then, is whether the trial court's order granting Todd's relocation petition constituted a "custody or allocation of parental responsibilities judgment or modification of such judgment," such that Danielle's immediate appeal of that order was proper. We hold that it was.

¶ 28 As used in Rule 304(b)(6), the phrase "allocation of parental responsibilities" is a term of art that derives from and is defined in the Marriage Act. As the relevant Committee Comments explain, a 2016 amendment to the Marriage Act changed the terms "Custody," "Visitation," and "Removal" to "Allocation of Parental Responsibilities," "Parenting Time," and "Relocation." Ill. S. Ct. R. 304, Committee Comments (adopted Mar. 8, 2016). Shortly

- 6 -

thereafter, Rule 304(b)(6) was amended "to reflect those changes." *Id.* Thus, to ascertain the meaning of the phrase "allocation of parental responsibilities," we must look to the Marriage Act.

¶ 29     Section 600(b) of the Marriage Act defines "allocation judgment" as "a judgment allocating parental responsibilities." 750 ILCS 5/600(b) (West 2016). Section 600(d) then defines "parental responsibilities" as "both parenting time and significant decision-making responsibilities with respect to a child." *Id.* § 600(d). Thus, under the Marriage Act, an allocation of parental responsibilities judgment is a judgment that allocates "both parenting time and significant decision-making responsibilities with respect to a child," and the "modification of such judgment" would be any decision that modifies either of those two variables.

¶ 30     Given these definitions, there is no question that the trial court's order granting Todd's relocation petition was an "allocation of parental responsibilities judgment or modification of such judgment" for purposes of Rule 304(b)(6). Paragraph 19 of that order states that "the granting of the removal petition is in the best interest of the children." Paragraph 21 then states that, accordingly, "[t]he court finds that it is in the best interest of [the children] that upon relocation *the parenting time of the parties be modified as follows*." (Emphasis added.) This finding is then followed by four distinct subparagraphs modifying the parties' allocation of parenting time from the existing weekly schedule of two parents living two miles apart in the same community to a seasonal schedule of two parents living in different parts of the country. In both vocabulary and substance, the trial court's order granting Todd's relocation petition modifies allocation of the parties' parenting time and thus by definition also modifies allocation of the parties' parenting responsibilities. The order therefore was immediately appealable under Rule 304(b)(6), and we are now free to move on to consider the merits of the trial court's decision.[1]

¶ 31                                    II. Relocation

¶ 32     The next question we must decide is whether the trial court erred in granting Todd's relocation petition. In adjudicating a relocation petition, a trial court's paramount consideration is the best interests of the children. *Id.* § 609.2(g). In this context, this court has explained that a best interests determination "cannot be reduced to a simple bright-line test" and that a ruling on the best interests of a child "must be made on a case-by-case basis, depending, to a great extent, upon the circumstances of each case." *In re Marriage of Eckert*, 119 Ill. 2d 316, 326 (1988). We also have stressed that "[a] trial court's determination of what is in the best interests of the child should not be reversed unless it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred." *Id.* at 328. Such deference is appropriate because " '[t]he trier of fact had significant opportunity to observe both parents and the child and, thus, is able to assess and evaluate their temperaments, personalities, and capabilities.' " *Id.* at 330 (quoting *Gallagher v. Gallagher*, 60 Ill. App. 3d 26, 31 (1978)).

_____

[1]Both the parties and the appellate court discuss *In re Parentage of Rogan M.*, 2014 IL App (1st) 132765, and *In re Marriage of Bendar*, 146 Ill. App. 3d 704 (1986), two decisions that previously considered whether decisions involving relocation constitute "custody" judgments. However, neither of these decisions speaks to the present question, as both turn on the construction of language that is no longer operative in either Rule 304(b)(6) or the Marriage Act, given the 2016 amendments.

- 7 -

Accordingly, " '[t]he presumption in favor of the result reached by the trial court is always strong and compelling in this type of case.' " *Id.* (quoting *Gallagher*, 60 Ill. App. 3d at 31-32).

¶ 33    The trial court here was faced with a contested relocation petition, and it conducted a three-day hearing at which both parties were given a full and fair opportunity to present evidence and testimony. In addition, the trial court conducted a thorough *in camera* interview with the parties' son to ascertain his thoughts and feelings about both the relocation and his relationship with his parents. At the conclusion of the hearing, the trial court entered a 13-page single-spaced order detailing both its factual findings and its application of those findings to each of the relevant statutory factors. Specifically, the trial court determined that (1) Todd's desire to relocate stems from a good-faith desire to give his children a better quality of life and that his belief that Virginia will provide that is reasonable and rationally based, (2) Danielle's objection to relocation stems from a good-faith concern that relocation could diminish her relationship with her children and that this concern is likewise reasonable and rationally based, (3) although the children enjoy a "good" relationship with Danielle, their relationship with Todd is "exceptional," (4) although there is little evidence with which to evaluate the academic quality of the relevant Virginia Beach schools relative to the schools in Galesburg, the children will undoubtedly benefit from Virginia Beach's greater ethnic and cultural diversity, (5) whereas the children have no extended family in Illinois, they will be living with their paternal grandparents in Virginia, (6) relocation's impact on the parties' son is likely to be insignificant, as he "specifically stated a preference for residing with his father who he views as the more stable, nurturing parent and clearly stated that he could adapt to not seeing his mother at the current level," (7) relocation's impact on the parties' daughter is likely to be greater, as she "has a stronger bond with her mother than [her brother] does," (8) upon relocation, a reasonable allocation of parental responsibilities can be fashioned so that both parties continue to enjoy a significant presence in and responsibility for the children's lives, and (9) the parties' son "clearly stated his preference for the granting of the petition for relocation and did so as an extremely articulate, mature 13-year-old who expressed reasoned and independent preferences as to relocation." Finally, on the question of whether Danielle herself had been discussing the possibility of relocating to Tennessee, the trial court specifically found that the parties' son's testimony on this point was "inherently honest and credible," that the discrepancy between this testimony and Danielle's testimony on this point was "troubling," and that Danielle's objection to Todd's relocation petition therefore "create[s] the existence of a possible double standard on the part of Danielle." Only "after taking all of the above into consideration," the trial court ultimately concluded that "the quality of life to [the children] will be increased by the allowing of relocation and the Court finds that the granting of the removal petition is in the best interest of the children."

¶ 34    After carefully reviewing both the record and the trial court's order, we find that there is absolutely no basis for concluding that the trial court's decision to grant Todd's relocation petition is so "clearly against the manifest weight of the evidence" that "it appears that a manifest injustice has occurred." 2018 IL App (3d) 170779, ¶ 34. On the contrary, the trial court's handling of this difficult case was in many ways exemplary. Each of the trial court's numerous findings is supported by evidence from the record, and we are in no position to second-guess its credibility determinations relative to Danielle's plans to relocate. See *People v. Pittman*, 211 Ill. 2d 502, 527 (2004). Moreover, the trial court did not paint a naïve and rosy portrait of relocation, nor did it simply ignore the evidence militating against it. The trial court

conceded that there were certain evidentiary gaps in the record, and it expressly acknowledged that relocation has the potential to significantly reshape Danielle's existing relationship with her children and most especially with her daughter. In the end, however, and only after stating that "[r]emoval cases are difficult" because "[n]o matter the outcome, one party's life will be affected detrimentally," the trial court ultimately concluded that relocation would be in the children's best interest. This was a perfectly reasonable conclusion based on the record before us, and we see no reason to dispense with what we have consistently characterized as a "strong and compelling" presumption in favor of the result reached by the trial court in such cases.[2]

¶ 35                                          CONCLUSION
¶ 36        For the foregoing reasons, the judgment of the appellate court is reversed, the judgment of the circuit court is affirmed, and the cause is remanded for further proceedings consistent with this opinion.

¶ 37            Appellate court judgment reversed.
¶ 38            Circuit court judgment affirmed.
¶ 39            Cause remanded.

---

[2]In reaching this result, we note that, in concluding that the trial court's decision granting Todd's petition was against the manifest weight of the evidence, the appellate court below made no attempt to apply the applicable standard of review. On the contrary, after setting out the applicable language from *Eckert*, the appellate court proceeded simply to reweigh the evidence for itself and decide that the scales favored denial of the petition. At no point did the appellate court identify what evidence the trial court's decision was "clearly" and "manifestly" against, what "manifest injustice" it was seeking to avert, or why suspension of the "strong and compelling" presumption in favor of the trial court's decision was warranted.