2021 IL App (1st) 210085-U
No. 1-21-0085
Order filed June 14, 2021

First Division

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| ADE WISE, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 D 79485 |
| | ) | |
| TEMEKA WILLIAMS, | ) | |
| | ) | Honorable |
| Respondent-Appellee. | ) | Mark J. Lopez, |
| | ) | Judge, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court.
Presiding Justice Walker and Justice Coghlan concurred in the judgment.

**ORDER**

¶ 1   *Held*: The trial court's modification of parenting time was not against the manifest weight of the evidence, and the trial court did not abuse its discretion in denying a petition for retroactive child support.

¶ 2   Eight-year-old M.W. is the daughter of Ade Wise and Temeka Williams, who never married. Wise and Williams began sharing parenting time when M.W. was eight-months-old. In 2015, when M.W. was two-years-old, Wise filed an emergency petition to establish paternity and temporary possession and custody. After trial, the court entered a judgment awarding Williams

parenting time. The court described Williams's conduct as impulsive and erratic and, in the best interests of M.W., gave Wise "primary parenting responsibilities" and most of the parenting time. The court ordered Williams, who had been hospitalized with mental health issues, to provide Wise with proof that she received mental health counseling. The court also ordered Williams to pay Wise $100 a month in child support and reimburse court costs.

¶ 3     In October 2019, Williams filed a petition seeking a modification of her parenting time. Wise moved to strike and dismiss the petition, arguing the petition (i) was premature, (ii) failed to plead a substantial change in circumstances justifying a modification, and (iii) was not in M.W.'s best interests. Wise also filed a petition for rule to show cause alleging Williams failed to provide proof of mental health counseling or reimburse him for costs. He also sought an increase in child support based on Williams' increased income.

¶ 4     The trial court denied Wise's motion to dismiss and his petition for rule to show cause and, after a two-day Zoom hearing, increased Wise's parenting time. The court also ordered Wise to pay Williams child support but offset that against what Wise owed Williams. It denied Wise's post-hearing petition for retroactive child support.

¶ 5     Wise contends the trial court erred in modifying the parenting schedule because Williams failed to show (i) a substantial change of circumstances, and (ii) a modification of parenting time in M.W.'s best interest. Alternatively, Wise contends the modification constituted an abuse of discretion as it increased the frequency M.W. goes between houses. Lastly, Wise contends the trial court abused its discretion by denying his request for retroactive child support.

¶ 6     We affirm. The trial court's finding that the circumstances had substantially changed and modified parenting time to be in M.W.'s best interests was not against the manifest weight of the

evidence. Nor did the record show the court abused its discretion in denying Wise's petition for retroactive child support.

¶ 7                                    Background

¶ 8     Wise and Williams met in 2002 while students at Duke University. Several years later, both had settled in Chicago. In August 2012, after a brief but intimate relationship, Williams gave birth to M.W. Williams informed Wise he was not her father. Before M.W.'s birth, Williams married and put her husband's name on the birth certificate. After the birth, Williams was twice hospitalized in a psychiatric unit, leaving M.W. with family. Williams's marriage was short-lived. She and her husband separated when he became abusive.

¶ 9     Eight months after M.W. was born, Williams contacted Wise and told him he was M.W.'s father. After Wise's parentage was confirmed, he began spending time with M.W., with Williams's supervision. By the fall of 2014, he had unsupervised overnight visits Monday, Tuesday, and Thursday evenings, and one weekend day each week. This informal arrangement was tenuous, however, and the subject of frequent disagreement. In March 2015, after an argument, Williams brought the police to Wise's home to pick up M.W. from a scheduled visit. The next day, Wise filed an Emergency Petition to Establish Paternity, for Temporary Possession and Custody and For Other Relief. Wise alleged Williams "suffers from mental illness, *** stopped taking her prescribed psychiatric medication, stopped attending her therapy sessions, and has exhibited severe emotional and mental instability." The trial court initially placed M.W. in Wise's temporary care and custody. By an agreed order, the court granted Williams parenting time from noon on Friday until noon on Monday. While the case was pending, Williams gave birth to a son, who is now five years old.

¶ 10    After conducting a five-day trial, the court issued a 44-page memorandum opinion and judgment on February 6, 2018, addressing parenting time, child support, and several other issues. The court found Williams "has been impulsive and erratic and made decisions that have demonstrated a lack of thought, planning[,] or consideration of consequences. In addition to telling [Wise] that she planned to move to Arizona, she moved to Wisconsin, and she most recently expressed *** her desire to move to North Carolina. Her life, at least for the last five years has been chaotic—several moves, at least two children by different men, who was not the alleged abuser that she married." Further, the court said, "[a]fter observing the parties, and listening to their testimony[,] the court believes that [Williams] is not stable financially, or otherwise, has made poor decisions regarding work, her relationships with men, and truly cannot discern what is in her own best interests, let alone what is in the best interest of the child."

¶ 11    The trial court awarded Wise "primary parenting responsibilities" and final decision-making authority but required he consult with Williams. As to parenting time, the trial court analyzed the best interest factors outlined in section 602.7 of the Marriage Act and said:

"Mother shall have regular parenting time as follows:

a. Mother shall have regular parenting time with the child on every Wednesday evening, from after school until one hour before bedtime.

b. Mother shall have regular parenting time with the child from every other Friday after school (or camp) and shall return the child to school or camp on Monday mornings. If Monday is a school holiday, the return shall be on Tuesday morning,

c. Mother may have additional parenting time as agreed to in writing between the parties."

¶ 12    The court granted Wise "all parenting time whenever mother does not have parenting time." Williams was allocated Columbus Day, President's Day and spring break, and Wise was

allocated Memorial Day weekend and Labor Day weekend. The parties divided other holidays and school breaks, alternating years.

¶ 13 The court also found it was in M.W.'s best interest for Williams to "participate in individual mental health counseling/therapy on an ongoing basis." The court required her to provide Wise with quarterly written proof that she was under the care of a licensed mental health professional. The judgment stated Williams "shall be guided by and follow the recommendation of her providers regarding her treatment and the frequency and duration of said therapy/counseling."

¶ 14 As to child support, the court stated "[a]t the conclusion of trial, [Williams] was anticipating starting a new job in the immediate future, but the amount of income that she would earn was unclear, and her job history has been inconsistent *** so applying the statutory factors would, at this time, not be appropriate. *** The court ordered Williams to pay Wise $100 per month in child support and to reimburse him for the $6,564.91 he paid in court expenses for the child's representative and the parenting coordinator. The judgment provided for review on an annual basis, with the first review to occur 24 months later, in February 2020.

¶ 15                    Petition to Modify Parenting Time

¶ 16 On October 16, 2019, Williams filed a petition to modify parenting time. Williams asserted that after the entry of the February 2018 judgment, she has been gainfully employed, has consistently exercised her parenting time, and taken M.W. to school in a timely manner. She asserted it is in M.W.'s "best interest" to "see her mother more than a couple of hours on alternating weeks," and M.W. "has a four-year-old sibling with whom [she] enjoys bonding." Williams sought to increase her parenting time to overnight visits every Wednesday and on Tuesdays and Thursdays during weeks when she does not have a weekend visit.

¶ 17    Wise filed a petition for a rule to show cause alleging Williams failed to provide proof of mental health counseling and to reimburse him $6,564.19 in court costs, as well as a petition to increase Williams's child support obligation based on her increased income and her decision to stop contributions to M.W.'s daycare expenses voluntarily. Wise also filed a combined motion to strike and dismiss Williams's petition for modification of parenting time under section 2-619.1 of the Code of Civil Procedure (735 ILCS 5/2-619.1 (West 2018). Wise alleged Williams's petition was premature because the trial court's judgment provided for review after February 6, 2020. Wise also alleged Williams failed to plead substantial changes in circumstances justifying a modification of parenting time as required under section 610.5 of the Marriage Act. 750 ILCS 5/610.5 (West 2018). Specifically, Wise asserted Williams's job, her timely transporting M.W. to school every other Monday, and M.W.'s relationship with her half-brother were contemplated by the February 2018 judgment, and did not constitute changed circumstances. Wise cited Williams's failure to provide proof of mental health counseling as required by the judgment as mitigating against granting her additional parenting time, asserting it was inconsistent with M.W.'s best interests, and supports the current parenting schedule remaining in place.

¶ 18    In response, Williams argued that becoming employed constituted a substantial change in circumstances, and allowed her to provide better living accommodations and structure for her children. Though she received the job offer before February 2018, the anticipation of a job is not the same as gainful employment. She also argued the court could consider M.W.'s relationships with her half-brother and Williams's mother, who lived nearby, in assessing best interests.

¶ 19    After a hearing, the trial court denied Wise's motion to dismiss and petition for rule to show cause. The trial court held a Zoom hearing on Williams's petition on October 1, 2020 and December 11, 2020. After both parties initially testified, Wise moved for a directed verdict, which

the trial court denied, stating the passage of 2.8 years amounts to a significant period in an 8-year old's life and was sufficient to meet the low threshold for showing a substantial change in circumstances. The trial court then heard again from both parties. We summarize their testimony.

¶ 20                                    William's Testimony

¶ 21    Williams, who was 39 years old, testified she has been working for Comcast in sales and marketing for nearly three years. She acknowledged that she received the job offer in December 2017, two months before the February 7, 2018 judgment. When M.W. attended school in person, she picked her up on Wednesdays. M.W. was presently attending school virtually at Wise's home; she picked her up there at 2:30 p.m. (though she acknowledged Wise allowed her to pick up M.W. as early as noon). Williams said she was working at home due to Covid and hired a friend to provide childcare for her son. The friend also watched M.W. on Wednesday afternoons while Williams worked.

¶ 22    In September 2019, M.W. spent a week at her house while Wise traveled to Italy. Williams had one other midweek overnight visit in June 2019, when M.W. had a doctor's appointment the next day. M.W. liked having more time with her and her half-brother. The children like to play school, go to the park and museums, play outside, ride their scooters, go swimming, read books, and play on their iPads. M.W. also participates in extracurricular activities, including gymnastics and ballet, but Wise objected to Girl Scouts because he did not want her to have too many activities.

¶ 23    Williams filed her petition because she thought M.W. "would benefit from having more time to *** be able to do her homework, not feel like *** there is this pressure to be done with everything. *** [T] here are times where getting her to and from her different extracurricular activities has been impacted *** by the schedule. And I want her to have more time with her brother [because they] have a strong bond and there is just not enough time for them." She also

suggested that more overnight visits would allow them to "spend quality time without always worrying that her dad is coming soon."

¶ 24   Addressing concerns raised by Wise, Williams took M.W. and her half-brother to a car caravan Black Lives Matter protest in the middle of the day without telling Wise, who learned about it when Williams posted a video on social media. Williams and the children did not get out of the car due to her concerns about safety.

¶ 25   In April 2020, M.W. had knots in her hair that could not be untangled and when her mother and grandmother could not help, she asked a friend from Milwaukee, who owns a hair salon, to come to her home to cut M.W.'s hair. (Williams presented a photo of M.W.'s haircut, which was admitted into evidence.)

¶ 26   Williams acknowledged a male "family friend" stayed at her home for more than three days when his new apartment fell through. And that she had a housewarming party during Covid. Still only her children and her son's father attended and she did not invite Williams to M.W.'s virtual birthday party because it was "just people we felt comfortable with."

¶ 27   On cross-examination, Williams said she did not feel obligated to tell Wise about the Black Lives Matter protest or that a male friend stays overnight. And she did not think she had to ask Wise for help with M.W.'s hair before having her friend cut it.

¶ 28   Williams acknowledged she was occasionally late dropping M.W. off at extracurricular activities and was once late dropping her off at school. She initially said she checks M.W.'s homework and helps her finish incomplete assignments. But later said she did not always make sure M.W. finished her homework during her parenting time, even though the information was available on the school's website. She noted that M.W. did not always have enough time to finish

her homework and eat dinner before Wise took her to his house at 7:00 p.m. She occasionally asks Wise for more time so that they do not feel rushed, and Wise usually agrees.

¶ 29    Williams does not raise the court proceedings in M.W.'s presence or talk about her relationship with Wise, but she does answer M.W.'s questions about those subjects. She does not think it is inappropriate for her to tell M.W. she misses her because she wants M.W. to know she is loved. She and Williams have "done a really good job" for M.W., but could improve on their communications with each other.

¶ 30    As to changes that have occurred meriting more parenting time, Williams said, "[M.W.] and I have a strong relationship, and *** she's doing well in school. I'm not a negative influence in her life. I love my daughter. I want her to have a strong relationship with her brother, and I encourage that. *** I do her homework with her. *** I prefer for her to have *** quality meals with her family, and *** my mom recently moved nearby. So I also encourage her relationship with my mom and spending time with my mom who now literally lives five minutes away." And her employment has changed because her new sales territory is closer to M.W.'s home and school, and she bought a home closer to Wise and M.W.'s school.

¶ 31                                              Wise's Testimony

¶ 32    Wise, age 36, worked as a marketing manager for three years and lived in Chicago about five minutes from M.W.'s school. During the Covid pandemic, Wise worked at home, adjusting his work schedule to facilitate M.W.'s remote learning. Wise said M.W. is a straight A student and during remote learning, "it is more important than ever to continue with [her] stability that she has had during school and to keep it a routine that has been successful for her, and to also be available and there to continue [to assist her]."

¶ 33    Wise objects to Williams having midweek overnight visits because "[M.W.'s] stability and education is [sic] very important to me. And there have been a lot of issues in the past with her completing assignments on time." M.W. usually gets an hour of homework a night. Often she has more to do when she returns from Williams's home on Wednesday evenings and after weekend visits.

¶ 34    Wise discussed his evening routine with M.W., saying she goes to bed around 8:00 or 8:30 p.m. He and M.W. relax between 7:00 and 8:00 p.m. and Williams calls M.W. most evenings for a 20-minute conversation., as called for in the February 2018 judgment. Wise had concerns about the calls because he said Williams told M.W. the parenting arrangement is unfair and "talk[ed] about very adult issues and constantly put[ ] her in the middle of court issues." He styles M.W.'s hair once or twice a week, and it is an "important aspect to me as a father to be able to take care of my daughter *** and for us to have that time together." The haircut Williams got for M.W. changed their routine because her hair is uneven, making it more difficult and time-consuming to style. When M.W. is with Williams, he expects Williams to tell him anything significant "that could affect her health or well-being," including a haircut.

¶ 35    Wise raised several concerns he had about Williams's judgment as a parent. Among them, Williams often arrived late to M.W.'s Saturday gymnastics class and made an inappropriate comment in front of M.W. that she did not think the class was safe because of "older girls being molested in gymnastics." Wise also questioned Williams's judgment in taking M.W. to a Black Lives Matter protest. He thought it might be an "unsafe environment." That Williams did not invite him to M.W.'s Zoom birthday party upset him because she invited people M.W. recently met. He had concerns about Williams's failure to go to therapy, as provided for in the judgment, "It was an

important factor to make sure that we were addressing behaviors and things that weren't being done in [M.W.]'s best interest."

¶ 36 Wise was bothered by email messages Williams sent to M.W.'s teacher on the joint parenting email account, which involved issues the teacher had already addressed. He felt the messages might negatively reflect on M.W. by suggesting her parents do not communicate or might "paint[ ] [her] home situation in a negative light." Also, in email messages to, among others, people at M.W.'s religious education program, Williams unnecessarily discussed their disagreements and legal issues.

¶ 37 Wise opposed changes to the parenting time. "We spent a significant amount of time in litigation coming to this schedule in [M.W.]'s best interest, and we've only been in this schedule for a short time, but [M.W] has been thriving academically and socially and mentally and emotionally, and I want to continue to keep her on this track that she's been on and what has really shown having positive results." As to Williams's mental health issues, many of her behavior[s] and actions have not changed since we were last in court, and *** those are still prevalent issues in our relationship and her relationship with M.W. today." Wise knows the parenting schedule will change eventually. He is open to having M.W. spend more time with Williams during the summer or on vacation but "it's paramount for me for [M.W.] to have continued stability, particularly throughout the school year."

¶ 38                                   Trial Court's Findings

¶ 39 After closing arguments, the trial court made an oral ruling. The court said, "First and foremost, with regards to substantial change, I would suggest and find that since the judgment was entered in February of '18 the child, who's eight years old, is now two years, ten months older than they were. That alone is a substantial change in circumstances." The court found both parties were

fit parents and, after discussing their strengths and weaknesses, said to Wise, "Even though it may not impact your day-to-day life, you have to understand that your daughter's family does include a half-brother with mom, and that is part of her world, and she needs to have that relationship fostered as much as any other relationship this child has with her *** parents." The court then modified the parenting time to allow Williams overnight visits every other Wednesday and on Tuesdays and Thursdays during weeks when she does not have weekend parenting time. The court continued the child support issue.

¶ 40    Post-trial, Wise filed a petition for $6,622 in retroactive child support and $888 for retroactive contribution to childcare expenses.

¶ 41    On December 29, 2020, the trial court entered a written order memorializing the modified parenting schedule and addressing the child support issue. The court found that Williams's increase in parenting time triggered the income share calculation set forth in section 505 of the Marriage Act. 750 ILCS 5/505 (West 2018). Under that provision, Wise owed Williams $122 per month, but the court credited that amount to the balance Williams owed Wise from the 2018 judgment. The court denied Wise's request for retroactive child support.

¶ 42                              Analysis

¶ 43    As a preliminary matter, we address Wise's contention that William's brief violates Illinois Supreme Court Rule 341 (eff. Oct 1, 2020), by being argumentative, failing to adequately cite to the record, and omitting necessary facts. Although Wise does not state what remedy he seeks, we presume he wants us to strike Williams's brief.

¶ 44    As Wise notes, an appellee's brief does not need to include a statement of facts "except to the extent that the presentation by the appellant is deemed unsatisfactory." Ill. S. Ct. R. 341(i) (eff. Oct. 1, 2020). But, if an appellee includes a statement of facts, as most do, it must comply with

Rule 341(h)(6). This Rule requires a brief's statement of facts "shall contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment, and with appropriate reference to the pages of the record on appeal." Ill. S. Ct. R. 341(6) (eff. Oct. 1, 2020).

¶ 45    We acknowledge that some citations to the record are incorrect or missing. We also agree that William's statement of facts occasionally becomes argumentative and "fails to paint a complete picture at times."

¶ 46    The rules of procedure for appellate briefs set out requirements to be met, and we may, in our discretion, strike a brief or dismiss an appeal for failing to comply with them. *Parkway Bank & Trust Co. v. Korzen*, 2013 IL App (1st) 130380, ¶ 10. But, where, as here, a brief is adequate in most respects, and the deficiencies do not hinder our ability to review the issues, we will not strike it. See *Spangenberg v. Verner*, 321 Ill. App. 3d 429, 432 (2001) (declining to strike brief that complied with rules in other ways and none of violations were so flagrant as to hinder or preclude review).

¶ 47                              Modified Parenting Time

¶ 48    Turning to the merits, Wise contends the trial court erred in modifying the parenting time because Williams failed to prove a substantial change of circumstances since February 2018 or that a modification was in M.W.'s best interests. Alternatively, Wise argues that even if Williams presented sufficient proof warranting a modification, the trial court abused its discretion by adding overnight visits every other Wednesday and on alternating Tuesdays and Thursdays because these changes greatly increased the number of times M.W. has to move between households.

¶ 49    Section 610.5(c) of the Marriage Act (750 ILCS 5/610.5(c) (West 2018)) governs modifications to a plan or judgment allocating parental decision-making responsibilities and parenting time. It provides, in relevant part:

"[T]he court shall modify a parenting plan or allocation judgment when necessary to serve the child's best interests if the court finds, by a preponderance of the evidence, that on the basis of facts that have arisen since the entry of the existing parenting plan or allocation judgment or were not anticipated therein, a substantial change has occurred in the circumstances of the child or of either parent and that a modification is necessary to serve the child's best interests." 750 ILCS 5/610.5(c) (West 2018).

¶ 50    This court has long favored maintaining continuity in parenting plans. *In re Marriage of Wycoff*, 266 Ill. App. 3d 408 (1994). Modification of a custody order involves two steps. See *In re Marriage of Debra N. & Michael S.,* 2013 IL App (1st) 122145, ¶ 47. First, the movant must meet his or her burden to show a substantial change in circumstances or the request to modify will be denied. Next, the court addresses whether modifying the parenting plan or allocation judgment is necessary to serve the child's best interests. 750 ILCS 5/610.5(c) (West 2018).

¶ 51    We afford great deference to a trial court's custody findings concerning parental responsibilities and custody, including modifications *In re Marriage of Bates*, 212 Ill.2d 489, 515 (2004). The trial court sits in the best position to judge the credibility of the witnesses and assess the best interests of the minor. *Id.* Accordingly, we review whether a custody modification judgment was against the manifest weight of the evidence. *Id.* "Where the evidence permits multiple reasonable inferences, the reviewing court will accept those inferences that support the court's order." *Id*. "Against the manifest weight of the evidence" means an opposite conclusion is apparent or when the court's findings are unreasonable, arbitrary, or not based on the evidence. *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 44.

¶ 52                    Substantial Change of Circumstances

¶ 53   Wise contends the trial court erred in relying solely on M.W.'s aging to find a substantial change of circumstances. Specifically, Wise asserts that a child's aging does not automatically constitute a substantial change of circumstances. We agree section 610.5 of the Marriage Act does not say that a child's aging automatically constitutes a substantial change in circumstances. Indeed, the statute does not define "substantial change of circumstances" or provide a list of changes that qualify. Nor have courts found a child's aging constitutes a substantial change of circumstances as a matter of law. But, as Wise concedes, courts have held a child's aging *may* constitute a substantial change of circumstances. See *In re Marriage of Anderson*, 236 Ill. App. 3d 679, 684 (1992).

¶ 54   For instance, in *In re Marriage of Anderson*, 236 Ill. App. 3d 679, 684 (1992), the trial court said that the "[p]etitioner asserts that the maturation of the child can never be sufficient to constitute a change in circumstances, although she fails to cite any authority for this proposition. However, a custodial arrangement that may be in the best interest of a seven-year-old child may not be in the best interest of a 14-year-old boy." The court declined to "create a new rule which would ignore that reality and which would be contrary to the spirit of the statute" but upheld the trial court's finding of a change of circumstances related to the child's needs and best interest. *Id.*

¶ 55   Similarly in *In re Marriage of Davis*, 341 Ill. App. 3d 356, 360 (2003), the court held "[i]n some cases, the differences between the needs of a small child and the needs of that same child as an adolescent can be sufficient to constitute a change in circumstances." We agree with Wise that *Anderson* and *Davis* are not directly analogous, as they involved longer passages of time and children of ages different from M.W.'s. But they do show a child's aging can constitute a substantial change in circumstance. M.W. was five years old when the February 2018 order was entered and eight when the trial court modified the parenting time. Those two years and ten months could, as the trial court concluded, equate with a substantial change in a child that age.

¶ 56    More significantly, we disagree with Wise's contention that the court overlooked other factors. Wise argues Williams's petition to modify parenting time alleges that three substantial changes—her job with Comcast, her timely transporting M.W. to school, and the existence of M.W.'s half-brother—as grounds for modifying the parenting time arrangement. Wise contends that all three were either known or anticipated in February 2018 so they cannot constitute a change. We disagree. In February 2018, Williams had received a job offer from Comcast, but she had yet to start that job. Indeed, in the February 2018 judgment, the trial court said Williams's income was "erratic and her work sporadic," noting she had recently lost her job and was receiving $2,200 per month in unemployment benefits and described her job history from 2012 onwards as "hazy and contradictory at best." By December 2020, Williams had been in her job for nearly three years and demonstrated job stability that was absent in 2018. She also showed financial stability, earning more than $81,000 at the time of the hearing. Moreover, she testified she had moved closer to Wise and M.W.'s school.

¶ 57    Regarding M.W.'s half-brother, a sibling relationship changes with age and becomes more central in a child's life the more time they spend together. Indeed, belying Wise's contention the trial court relied on M.W.'s aging alone, the judge addressed M.W.'s relationship with her half-brother telling Wise it "is part of her world, and she needs to have that relationship fostered as much as any other relationship this child has with her family members, her parents." In determining a substantial change in circumstances, a trial court must look at the totality of the circumstances. *In re Marriage of Davis*, 341 Ill. App. 3d 356, 359 (2003). The change in circumstances must directly affect the needs of the child. *In re Marriage of Diddens*, 255 Ill. App. 3d 850, 855 (1993). M.W.'s maturation, her mother's demonstration of job stability, and the continuing relationship

with her brother, directly related to her needs and showed substantial changes warranting a modification of parenting time.

¶ 58                                    Best Interests of the Child

¶ 59    Wise argues that even if Williams proved a substantial change of circumstances, we should reverse on the basis the trial court failed to address M.W.'s best interests, and Williams failed to prove modifying the parenting time schedule was in M.W.'s best interests.

¶ 60    Section 602.7 of the Marriage Act requires courts to allocate parenting time in accord with the best interests of the child. 750 ILCS 5/602.7(a) (West 2018). Section 602.7 of the Marriage Act provides that in determining the child's best interests for the purpose of allocating parenting time, courts must consider relevant factors, including: (1) the wishes of the parent; (2) the wishes of the child; (3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities; (4) any prior agreement or course of conduct between the parents relating to the caretaking functions with respect to the child; (5) the interaction and interrelationship of the child with his or her parents and siblings or any other significant person; (6) the child's adjustment to home, school, and community; (7) the mental and physical health of all involved; (8) the child's needs; (9) the distance between the parents' residences, the cost of transporting, the families' daily schedules, and the ability of the parents to cooperate; (10) whether a restriction on parenting time is appropriate; (11) physical violence or threat of physical violence; (12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs; (13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child; (14) the occurrence of abuse against the child or other members of the household; (15) whether one of the parents is a convicted sex offender; (16) the terms of a

parent's military family-care plan; and (17) any other factor that the court expressly finds to be relevant. *Id*. § 602.7(b).

¶ 61    "Although a trial court must consider all relevant factors when determining the best interests of a child, it is not required to make an explicit finding or reference to each factor." *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43. "Generally, we presume that a trial court knows the law and follows it accordingly." *Id*.

¶ 62    Wise acknowledges a trial court does not need to make explicit findings about each best interest factor. Still, he contends the trial judge's complete silence on the best interest issue indicates he never considered it and was an error in law requiring reversal. We agree the trial judge's oral ruling did not expressly address the best interest factors or explicitly hold that modifying parenting time was in M.W.'s best interest. But the trial court heard testimony and argument from both sides about M.W.'s best interests. Further, when issuing the oral order, the trial court said to Williams, "[o]ne of the biggest factors in the child's best interest is how you foster a healthy relationship with the other parent ***." Although the trial judge might have said more on the issue so that Wise would better understand its reasoning, the record indicates the court considered best interests, and we presume the court followed the law. *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43.

¶ 63    Wise contends regardless of error, Williams failed to meet her burden to show a modification of parenting time was in M.W.'s best interest. Alternatively, Wise contends even if a modification was warranted, granting Williams overnight visits every other Wednesday and every other Tuesday and Thursday constitutes an abuse of discretion by increasing the times M.W. has to go between houses from three to six every 14 days.

¶ 64 On the best interest issue, Williams testified M.W. would benefit from having overnight visits on Wednesdays because she would have time to do her homework, rather than being rushed to complete homework and dinner before returning to Wise's house at 7:00 p.m., especially when Williams picks her up at 5:00 or 5:30, and, as Wise testified, M.W. has at least one hour of homework a night. Williams also testified M.W. participates in many activities with her half-brother and would benefit by spending more time with him and her mother, who lives nearby. The trial court found M.W.'s relationship with her half-brother to be a significant factor, noting it should be fostered as much as any other relationship, including M.W.'s relationship with her parents.

¶ 65 Our supreme court has held a best interest determination "cannot be reduced to a simple bright-line test" and a ruling on the best interests of a child "must be made on a case-by-case basis, depending, to a great extent, upon the circumstances of each case." *In re Marriage of Fatkin*, 2019 IL 123602, ¶ 32 (quoting *In re Marriage of Eckert*, 119 Ill. 2d 316, 326 (1988)). The supreme court also has stressed "[a] trial court's determination of what is in the best interests of the child should not be reversed unless it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred." *Id*. ¶ 32 (quoting *Eckert*, 119 Ill. 2d at 328). Deference is appropriate because "the trial judge is in a better position than we are to observe the personalities and temperaments of the parties and assess the credibility of the witnesses." *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 21. Accordingly, "'[t]he presumption in favor of the result reached by the trial court is always strong and compelling in this type of case.'" *Fatkin*, 2019 IL 123602 ¶ 32 (quoting *Gallagher*, 60 Ill. App. 3d at 31-33).

¶ 66 Considering all relevant factors, we cannot conclude the trial court's decision to grant Williams additional parenting time was against the manifest weight of the evidence, was

manifestly unjust, or was the result of an abuse of discretion. The trial court assessed the parties and their credibility and its modification of parenting time, which still favors Wise, was appropriate and supported by the record.

¶ 67                                Retroactive Child Support

¶ 68    Lastly, Wise contends the trial court erred in refusing to award him retroactive child support dating to his November 4, 2019 petition. In his petition, Wise argued two "substantial changes" warranted an increase—Williams's new job and a yearly salary of $50,000 and her decision to stop voluntary contributions to M.W.'s daycare expenses.

¶ 69    The trial court has the discretion to award or not to award child support on a retroactive basis. *In re Marriage of Sawicki*, 346 Ill. App. 3d 1107, 1119 (2004). ¶ 41. The trial court entered the order denying the motion for retroactive child support after hearing argument. Its order does not state the grounds for denying the motion. The record includes a transcript of the hearings, but nothing in it directly discussed retroactive child support. Thus, the rule in *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984), applies. Under *Foutch,* the "appellant has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error" *Id.* Thus, where the record is incomplete, we must "presume[ ] that the order entered by the trial court was in conformity with law and had a sufficient factual basis" and must resolve against the appellant "[a]ny doubts which may arise from the incompleteness of the record." *Foutch*, 99 Ill. 2d at 392.

¶ 70    Wise had the burden to present a sufficiently complete record of the proceedings to support the claimed error. In the absence of that record, we presume the order entered conformed with rh law and had a sufficient factual basis. *Id.* at 391-92.

¶ 71    Affirmed.