2021 IL App (1st) 210065-U

No. 1-21-0065

Order filed November 19, 2021

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| In re the Marriage of: | ) | Appeal from the |
| | ) | Circuit Court of |
| ALIZA BARSKY, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | No. 14 D 4095 |
| | ) | |
| v. | ) | Honorable |
| | ) | Regina Ann Scannicchio, |
| ROBERT BARSKY, | ) | Judge, presiding. |
| | ) | |
| Respondent-Appellant. | ) | |
| | ) | |

JUSTICE SHARON ODEN JOHNSON delivered the judgment of the court.

Presiding Justice Pierce concurred in the judgment.
Justice Harris dissented.

**ORDER**

¶ 1    *Held*:    We affirm where: (1) the decision to grant Aliza's motion for relocation was not against the manifest weight of the evidence pursuant to the statutory factors in section 609.2(g) of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/609.2(g) (West 2018)) and (2) the trial court did not err in ordering Robert

to have "no contact of any kind," because it followed the serious-endangerment standard.

¶ 1     Following a bench trial, the trial court entered a judgment in favor of Aliza's petition to sever joint custody and petition to relocate to France with her and Robert's minor children N.B and G.B. On appeal, Robert contends that: (1) the decision to grant relocation was against the manifest weight of the evidence, and (2) the trial court erred in ordering that he have "no contact of any kind." For the following reasons, we affirm.

¶ 2                   I. BACKGROUND

¶ 3                A. Procedural Background

¶ 4     Robert and Aliza were married on July 19, 2005, in Washtenaw, Michigan. Their marriage produced two children: N. B, born on June 27, 2006, and G. B. born on July 22, 2010 (collectively the boys). G. B. was born with phenylketonuria (PKU), a severe metabolic disorder that would require a strict diet for the rest of his life, if not managed properly it could lead to irreversible brain damage.

¶ 5     The family moved to Chicago, Illinois in 2012, but in February 2014, after a violent incident with N.B., the parties separated. Aliza filed for a dissolution of marriage on May 14, 2014. On August 26, 2015, the trial court entered a custody judgment and parenting agreement.[1] The trial court ordered joint custody, with Aliza as the designated primary residential parent. The order provided that both parents would jointly decide matters pertaining to the minor children's health care, religious training, and education. Day-to-day decisions would be decided by the parent who had them at the time.

---

[1] Our subsequent review is pursuant to the terms reflected in the amended statute contained in section 5/609.2 of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/609.2 (West 2018)) not the terms reflected in the parties' agreement. This statute was amended on January 1, 2016.

¶ 6    On July 19, 2017, the trial court entered a judgment for dissolution of marriage and subsequently amended it on July 21, 2017; both judgments incorporated the parties' marital settlement agreement and the prior custody judgment.

¶ 7    On October 12, 2017, Aliza filed a police report alleging that Robert hit N.B. in the head with a closed fist while at Sukkot luncheon at their synagogue.  Thereafter, on October 13, 2017, the trial court entered an agreed order suspending Robert's parenting time and permitting only supervised visits at the sole discretion of Aliza. The order also appointed Dr. Phyllis Amabile to evaluate Robert.

¶ 8    On October 16, 2017, Aliza filed a petition for an order of protection against Robert describing the October 12 incident, and the toll it took on their sons.

¶ 9    On November 9, 2017, Robert filed a motion for appointment of guardian ad litem or child representative to represent the interests of the boys. Robert argued that the communication between the parties regarding the boys were ineffective and not in their best interest. Robert's motion was granted on December 20, 2017. Specifically, the trial court granted Robert communication with his sons and appointed Stuart Gelfman as the children's representative and one of the people authorized to supervise visits.

¶ 10    On April 18, 2018, the trial court granted Robert additional parenting time to be supervised by Nancy Cohen & Associates (Nancy Associates).

¶ 11    On October 7, 2018, during a supervised visit, N.G. mentioned to Robert that he wanted to move to France. The supervisor, Heidi Meister (Meister) who was assigned by Nancy Associates, saw the agitation between the two and unsuccessfully attempted to mediate; she then terminated the visit due to Robert's behavior.

¶ 12    On November 29, 2018, Aliza filed with a notice of intent and petition to relocate the children pursuant to section 609.2(g) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/609.2(g) (West 2018)). The petition detailed how the statutory factors included in the Act demonstrated that France was in the best interest of the children. Aliza explained that she was the primary caregiver to the boys and noted that Robert had a lack of involvement and participation in their lives.  Aliza stated that even when Robert had time with the boys it was always "fraught with problems" and the boys would experience severe emotional issues because of him. Aliza recalled the physical abuse Robert inflicted on N. B. at their synagogue and noted that although it was not the first time, it was the first time in public and it resulted in emotional harm to the children. Aliza recounted how she was born in Paris and intended to stay in a historically Jewish community. She added that, in Paris, she had a great deal of extended family and people who would support her and the boys financially and emotionally but would also help her manage G.B.'s PKU, unlike Robert who had not been able to be of assistance. Aliza noted that there would be no language barrier because the boys spoke French. Additionally, G.B. would benefit from the universal healthcare and specialized knowledge of PKU in the French medical community. Aliza indicated that since the boys stopped seeing their father, she and their teachers noticed an improvement in their social interactions. Aliza stated that the boys would go to the best Jewish school in Paris; École Yabné. She was also receptive to establishing a parenting schedule where Robert would have scheduled parenting time with the boys in France.

¶ 13    On November 29, 2018, Robert also moved to reinstate his parenting time and appoint break through family solutions.[2] In support of reinstating his parenting time, Robert argued that it was in the best interest of the children to have both of their parents in their lives. Within six months,

_____

[2] This is a group of Chicago area based therapists who specialize in working with high-conflict families. https://breakthroughfamilysolutions.net/content/about-us

Robert recalled he was given eight visits that totaled to no more than 12 hours with the boys and insisted that this was not enough to foster a healthy relationship. Robert believed that Aliza encouraged the boys to sever the relationship with him and desired to remove them from his life. Robert argued for the appointment of break through family solutions because the relationship he had with the boys was fractured, and he believed that it would help facilitate a better relationship between them.

¶ 14    On December 28, 2018, Robert filed a response to the petition to relocate. Robert argued that he understood PKU but was not allowed to demonstrate this knowledge because of Aliza. Robert also argued that he was involved with the boys and any lack of involvement was because Aliza discouraged them from communicating with him. Robert admitted to striking N. B. on the side of the head, but insisted he was undergoing therapy. He also relied on the and the Department of Children and Family Services (DCFS) determination that the claims of abuse were unfounded. Robert explained that the only reason the relationship with the boys had been fractured since October 2017, was that they had not seen each other since then and that Aliza interfered with their scheduled phone calls and supervised visits. Robert insisted that because the boys were already established in Illinois, moving to France would not enhance or improve the quality of their lives.

¶ 15    On January 22, 2019, Aliza filed a response to Robert's motion to reinstate parenting time and appoint break through family solutions. Aliza agreed that it was in the best interest of the children to have a healthy relationship with both parents, however, communication between Robert and the children had grown increasingly worse despite the therapy that the boys and Robert were undergoing. Aliza argued that the relationship Robert had with the boys was a direct reflection of Robert's behavior and requested that the court deny his request to reinstate his parenting time. She

also informed the court that the family was not eligible for break through family solutions because of Robert's history of domestic violence against them and his mental illness.

¶ 16     On November 18, 2019, Aliza filed an emergency petition to allow the minor child to participate in advanced science curriculum, to sever the joint parenting agreement and custody judgment, to grant her sole allocation of decision-making responsibilities, and to grant other relief. Aliza argued that Robert failed to respond to her request in regard to allowing N. B. to participate in a specialized curriculum for 12 weeks, resulting in N. B. not being allowed to participate. In order to avoid this from happening in the future, Aliza sought authorization to enroll N. B.  into any classes without Robert's prior approval. Aliza argued that because of Robert's inability to effectively communicate and make decisions for the boys, the trial court should sever the joint parenting agreement and give her the sole decision-making responsibilities. On the same day, Aliza filed an amended emergency motion that made the same demands but included that Dr. Amabile recommended and supported her request in her 2019 report.

¶ 17     On November 21, 2019, Robert filed a response to the emergency petition. Robert denied that this matter was an emergency and denied that he failed to make a decision regarding N. B.'s curriculum. Robert explained that he was researching what was best for N. B. so that he could make an informed decision. Robert argued that his input regarding education for the boys was critical and Aliza should not be the sole decision-maker.

¶ 18     On November 22, 2019, the trial court ordered Mr. Gelfman to email all parties the recommended curriculum. If either party had an objection, the court would hear the argument prior to memorializing the curriculum into a court order. The trial court did not rule on the motion to sever joint custody.

¶ 19    On January 2, 2020, Aliza filed a second emergency motion, wherein she advised the trial court that Robert did not comply with the November 22, 2019, order and failed to give his consent regarding N. B.'s school curriculum. Again, Aliza sought an order authorizing N. B. to participate in any curriculum offered to him.

¶ 20    On January 3, 2020, Robert filed an objection to the second emergency motion arguing that he did not respond because his attorney was unavailable at that time Robert argued that Aliza's motion should be denied because she had prior knowledge that his attorney was not available, she failed to give proper notice, and the matter was not an emergency.

¶ 21    On January 6, 2020, the trial court entered an order authorizing N. B. to participate in the recommended curriculum.

¶ 22                    B. Trial on Aliza's Petition to Relocate

¶ 23    The trial court held a remote trial on Aliza's petition to relocate, Robert's petition to reinstate parenting time, and Aliza's petition to sever joint custody on June 23 and 24, 2020. The parties agreed to the manner in which the proceedings would be conducted, and respectively submitted several documents into evidence for the trial court to consider.

¶ 24    Aliza caused Dr. Amabile's April 22, 2019, report, to be admitted into evidence. The report contained the following findings and recommendations: (1) all parties should continue therapy; (2) the Barsky's have no co-parenting abilities and Aliza should have the final say of all decisions, while keeping Robert informed; (3) a reunification therapist, preferably Dr. Gail Grossman, should be appointed to oversee the reintroduction of Robert and the boys; and (4) the court should reassess after one year.

¶ 25    Robert submitted Dr. Louis Kraus'[3] June 31, 2019, report, for admission into evidence. Dr. Kraus' report which concluded that: (1) Aliza and Robert were unable to co-parent and therefore Aliza should remain the decision-maker when it came to the boys' education; (2) both Robert and Aliza could make decisions jointly about religion; (3) the trial court should make decisions for mental health intervention for the boys, otherwise, Aliza should be the decision-maker for all other medical decisions; (4) Robert was never recommended to be the sole decision-maker of any aspect of the boys' lives; (5) removal to France was strongly not recommended; (6) reintegration therapy should have been put into place; (7) despite the documentation evidencing Robert's violence, he was determined to not be a threat to his sons; and (8) Aliza should meet with a behavioralist to set up boundaries and behavioral repercussions for not seeing their father.

¶ 26    Dr. Grossman submitted a report dated April 30, 2020. She detailed how she was unable to conduct reunification therapy because the boys refused to participate in any capacity. Dr. Grossman cautioned that forcing the boys to participate in such therapy, given their positions, would not be beneficial at that time but could be revisited in the future.

¶ 27                                    1. Aliza

¶ 28    Aliza testified in her case-in-chief, that at the time of the trial G. B. was going to be 10 years-old in a month, while N. B. was 14 years-old. Aliza stated that she and Robert were married in 2005 and it was dysfunctional from the beginning. Aliza recounted seeing Robert have approximately 70 to 80 episodes which included verbal, psychological, and physical abuse ranging from fits of violence to rage.  One such incident occurred when N. B. was 20 months-old and the family was on a sabbatical in Israel: Robert punched her in the face. Aliza recalled another incident when she was holding N. B. and Robert punched her, twisted her arm, pushed and hit her

---

[3] Dr. Kraus was appointed by the trial court on February 14, 2019, at the request of Robert.

repeatedly, and broke her tooth. Aliza indicated that she stayed with Robert because she perceived his behavior as a medical issue, and she thought it would be healthier for her sons to have both parents.

¶ 29    Although she had gone to a domestic violence shelter in 2008, and met with a matrimonial lawyer in 2010 and 2012, she moved to Illinois with Robert with the stipulation that even though they were no longer a couple, they would share an apartment for the sake of the boys. Aliza testified that during this period, when Robert would come home from work, G. B. would run and hide, while N. B. stood ready to provoke his father to avoid having to wait for his father to explode on his own; this lasted for 19 months. Their time together as a family ended the day Robert shoved N. B., who was seven years-old at the time, against a wall when N. B. attempted to protect Aliza from Robert. Aliza informed Robert that she would not press charges against him and would keep the abuse private from their tight-knit community, if he gave her a peaceful separation; they separated in 2014.

¶ 30    Aliza testified that Robert had severe mental health and executive functioning issues.  She stated that consequently Robert was inconsistent, unpredictable, unreliable, lacked common sense, manipulative, impulsive, hectic, and not able to multitask. She also stated that Robert had poor self-control, lacked common sense, and took no responsibility regarding the boys during their marriage. Aliza added that despite these issues, Robert was nonetheless intelligent, a great violinist, teacher, and financial provider.  She also informed the trial court that while he understood G. B.'s PKU intellectually, he never put his knowledge to practice despite repeated training and help from others.

¶ 31    Aliza stated that she had always tried to make it possible for Robert and the boys to continue their relationship. However, Robert was not able to have parenting time for longer periods

of time or overnight. Beyond the boys, she continued to help Robert personally with his own basic adult tasks such as: paying bills, buying him groceries, preparing meals, doing his taxes, reminding him to refill and take his own medicine, etc.

¶ 32    Aliza testified that G. B. was defiant and aggressive with his father and Robert could not handle that. Aliza found that Robert was competitive and insecure with N. B. and allowed N. B. to "compensate for his own inability to function." This dynamic resulted in N. B. feeling empowered and in charge; which enraged Robert. Aliza observed that both of the boys seemed to enjoy spending time with their father when he was able to control himself, however, over time the bad times simply outweighed the good.  She surmised that as the boys grew older and more cognizant of Robert's problems, they became more unwilling to be around him.

¶ 33    Aliza recounted multiple incidents of Robert's mistreatment of the boys. Specifically, Robert had a habit of leaving them unattended and on one occasion gave N. B. a shot of whiskey when he was nine years-old. Aliza recalled that G. B. reported that Robert: threw a glass and an iPad toward G. B. and told him to lie about how the iPad broke. He also struck G. B. in the shoulder, shook him, and threatened him with a fist. Aliza testified that N. B. complained that Robert would not stop criticizing Aliza, used him as a messenger, and caused him to feel unsafe. Aliza stated that she did not know the full extent of the abuse he inflicted on the boys until Robert punched N. B. in the head; at that point other people started to report all the incidents of abuse they saw Robert commit against the boys.

¶ 34    Upon learning about the other incidents of abuse, Aliza expressed a sense of  guilt for trying to facilitate a relationship with Robert and the boys; she believed she gave Robert a setting to allow the abuse to occur. Aliza testified that when the supervised visitations and therapy sessions started,

it just added more chaos because the boys did not want to participate, and Robert always changed their meetings.

¶ 35    Aliza stated that she observed the symptoms of trauma that developed. G. B. as a result of their relationship with Robert became progressively violent and aggressive, developed night terrors, and displayed defiant behavior in home and school. N. B. became highly depressed, anxious, violent, and suicidal. Aliza testified that the boys were only better at the time of trial because they were not forced to do reunification therapy with Robert.  Further, Aliza informed the trial court that their family should not be considered for reunification since they had experienced domestic violence. Aliza added that therapy would likely not work given Robert's documented mental illness and because he was in the beginning stages of dementia at the age of 63.

¶ 36    Aliza testified that Robert was unable to control himself and at one point he showed up barefoot to a supervised visit at a bowling alley. Aliza stated that in doing so, it demonstrated how dysfunctional and out of touch with reality he was.

¶ 37    Aliza stated that she was the primary caregiver and decision-maker for the boys. Aliza explained that allowing Robert to participate in decision-making for the boys resulted in many decisions, that were medical and school related, being stalled by him. Aliza recalled that often, Robert became a subject of conversation amongst the classmates of the boys. The boys were often vilified for not communicating with Robert because Robert would seek out information on the boys from the community. This led to their classmates repeating "nasty" comments that their parents would say about their family. Adults and children alike, whether they knew them or not, would approach the boys providing their opinion about their family situation.

¶ 38    Aliza testified that France would be a new start that would have a positive psychological impact on the boys and would allow them to have the support of family and friends. Aliza stated

that she shared her French culture with the boys. Aliza described that the network of family and friends in France would facilitate psychological, practical, and financial support in addition to support for G. B.'s PKU. Aliza indicated that the healthcare system was more specialized in regard to PKU, and it was more affordable. Aliza noted that the boys would attend École Yabné, which she described as an exceptional and affordable Jewish school where the boys already had friends. Aliza expressed her concern about N. B. would have to attending high school in Illinois at Ida Crown Jewish Academy. She acknowledged that it had nationally ranked teachers, but it was only blocks from Robert's house.

¶ 39    Aliza testified that personally she had reached her limits with staying in Illinois in part because she had no support with G.B.'s PKU. Aliza believed the boys needed a break first before reconnecting with Robert. She contends that the relocation would benefit everyone.

¶ 40                                    2. Robert

¶ 41    Robert testified as an adverse witness to Aliza's case-in-chief. Robert informed the court that Aliza agreed to relocate to Ann Arbor Michigan with him in December 2004. After the birth of N. B., Robert testified that he would often go for walks with him to help calm him when he would cry. Robert recalled enjoying every aspect of caring for his newborn baby, he would even serenade him with his violin. Robert stated that on N. B.'s first birthday, his sister Roz came over to celebrate from Philadelphia with her two teenage sons. During her stay, Robert came home from work, and he could sense some tension between his wife and sister, he found out that his nephew improperly used a Kosher knife and Aliza aggressively reprimanded him. Robert recalled that after this incident, Roz left early, and Aliza went into a rage promising he would never see his nephew again and she succeeded in keeping the two families apart. Robert testified that Aliza took the

present that Roz bought for N. B. and destroyed it, she cried afterwards, and he forgave her. Roz was finally able to see N. B. and G. B. after the divorce.

¶ 42    Robert recalled the time in Israel as a time where he had precious moments with N. B. Robert acknowledged that the relationship with him and Aliza had some "tension," but they worked through it for the sake of N. B. Robert indicated that although he had executive functioning issues, he was always working to "resolve these deficits." Robert stated that he had this challenge his entire life and had developed techniques that allowed him to overcome them and succeed professionally. Robert testified that Aliza had always had difficulty accepting his executive functioning diagnosis even though he had been transparent with her from the very beginning of their relationship. Robert recalled when N. B. was a toddler, Aliza would "comment with irritation" about how slow he was in front of N. B. Robert additionally recalled when Aliza would complain about how long it would take him to do tasks and how forgetful he was. Robert testified that during their stay in Israel, Aliza ridiculed him by saying that he was so mentally ill, that even his friends asked her why she was with him: Robert responded by hitting her in the face. He expressed to the court how he was shocked and embarrassed at his own actions.

¶ 43    Robert testified that the two of them had different parenting styles; Aliza was the disciplinarian while Robert "leaned in the other direction." Robert stated that he had struggled with assertiveness his whole life and he was still working on that in therapy.

¶ 44    Robert detailed that as a father to N. B., he would often play with him and read him stories on a daily basis, if not more. Robert recalled that N. B. started playing violin at the age of three, Robert helped coach him, and would duet with him.

¶ 45    Robert testified that he and Aliza were still together as husband and wife when they had G. B. in 2010. When he was a week old, they discovered his PKU condition. Robert recalled the home

being tense because they were trying to "come to grips" with G. B.'s condition. Robert testified that when he tried to spend time with N. B. it would become a source of conflict between him and Aliza. Robert stated that they eventually learned how to manage G. B.'s PKU.

¶ 46    Robert detailed how the family moved from Michigan to Illinois in 2012 because they wanted to be a part of a larger modern Orthodox community, which their neighborhood in Michigan did not have.  The boys loved the change and Robert excelled at his job at the Federal Reserve.

¶ 47    Robert expressed that he was afraid of Aliza and whatever potential punishment she would decide he deserved based on wrongs that she believed he committed. Overall, he felt humiliated about the comments she made to him in regard to his executive functioning issues. Robert testified that when the boys were eight and four, they decided to live separately, and Aliza would restrict his access to the boys. Robert recalled that when he was alone with the boys, they all enjoyed themselves. Robert recalled specifically spending time with G. B. between the ages of five and seven, which involved a lot of playing and storytelling. Robert stated that he was actively involved with G. B.'s school and participated in events.  Robert described G. B. as being disturbed with how little time he got to spend with his father, often crying "it's not enough" when it was time to go back with Aliza. Robert recalled the time spent with N. B. as being full of activities. Robert described a wide-range of activities that he and the boys took part in, from time spent in the synagogue to visits to museums.

¶ 48    Robert testified that the couple had a custody agreement in place that was entered on August 26, 2015, which was suspended after he attacked N. B. Robert stated that because he was so heartbroken over his actions, he agreed to suspend his parenting time but wanted to resume it.

Robert indicated that his understanding was that the suspension was for 30 days and would not last for over two years. Robert testified that the order ruined the relationship with the boys.

¶ 49    Robert stated that Mr. Gelfman and Dr. Amabile both described him as having positive interactions with the boys. Robert testified that when supervised visits began, Mr. Gelfman described N. B. as being "reticent" at first but then after a few minutes he was engaged and having fun. Robert recalled that Mr. Gelfman described the interaction with G. B., as if they "never skipped a beat." Robert stated that Dr. Amabile reported observing a loving relationship between Robert and the boys; one where Robert was attentive and appropriate. Robert testified, consistent with his pleadings, that DCFS concluded that the claims of abuse were unfounded based on its investigation.

¶ 50    Robert recalled that he began to see a difference in N. B. that he believed was due to N. B. resenting having to reserve additional time in his already busy schedule for meetings. As a result, Robert concluded, N. B. asked for less time. Robert testified that his conversations with G. B. were more talkative, however, neither of the boys could rely on him to help them with their lives because of the restrictions placed on their time together. Robert complained that the calls and visitations were infrequent due to Aliza.

¶ 51    Robert testified that the last time he saw the boys was at a supervised visitation. Robert recalled N. B. mentioning that he was going to France and when Robert responded, he was told he was too loud by Meister. Robert insisted that he could not have been that loud, but Meister canceled the visit. Robert stated that after that incident, Meister tried to arrange joint therapy for Robert and the boys. Robert informed the trial court that he was seeking help to reunify with the boys. He expressed how painful it was to miss out on so many moments with the boys.

¶ 52    Robert testified that relocation should not be granted. Instead, "full-blown" reunification should have been ordered, and he should have been granted joint decision-making with the involvement of the children. Robert explained that from each of the boys' birth, he was always an active parent from morning to night. Robert stated he never spared any expense with the boys and was the sole provider. Robert indicated that he and Aliza never disagreed on medical decisions regarding the boys, and he did not believe there was a superior treatment offered in France for PKU. Robert believed that because of his absence the boys were not as strong as they could be in their math. Robert denied causing any delay to N. B.'s academic schedule and insisted that he responded accordingly when prompted by Aliza to consider his opinion on courses. Robert testified that Aliza declared she would make the final decision, but he could offer his opinion. Robert explained that he took his time to research this decision and when he tried to discuss his findings with Aliza, she stated that she already made the decision.

¶ 53    Robert stated that he had an outstanding understanding of PKU, but he was not taught properly how to manage it.  Robert insisted he needed to be with G. B. in order to help him and he needed the right teacher, but he could learn how to manage it.

¶ 54    Robert testified that if the petition to relocate was granted it would effectively terminate his parenting rights because there was no evidence that Aliza would support any contact between him and the boys. Robert stated that neither Dr. Amabile nor Dr. Kraus recommended relocation and instead insisted on reunification therapy.

¶ 55    Robert informed the trial court that antisemitism in France was another reason why the motion should not be granted. Robert referenced a report authored by Dr. Gunther Jikeli, which substantiated his concerns. Dr. Jikeli concluded that antisemitism was on the rise in both locations,

however, in France Jewish children have lost their lives because of their religion, while Jewish children in Illinois do not suffer the same fate.

¶ 56    Robert informed the trial court that he had attended all recommended therapy and courses and would continue to make improvements.  Robert expressed his concern that one day the boys would regret the time lost with their father and his continued absence would only hurt them.

¶ 57    In rebuttal, Aliza expressed her concern that Robert appeared to lack accountability and truthfulness for the things that have happened in their lives. Aliza testified that Robert justified hitting her because of her provocation, he blamed the supervisor for cutting the visit short, and implied that because DCFS unfounded the allegations that nothing happened. Aliza found that this was an indication that nothing would change if they remained in Illinois.

¶ 58    Aliza denied ever humiliating Robert, screaming at him in front of the boys, or interfering with his parenting time. Aliza stated that she did not totally recall the interaction with his sister, however, she did recall that when his sister left, she had written "bitch" on the walls in lipstick; and despite this she still encouraged Robert to have a relationship with her.

¶ 59    In sur-rebuttal, Robert testified that everything Aliza stated was a lie, except for what she stated about his executive functioning disorder and her being supportive of the boys having a relationship before 2017. Robert acknowledged he did not recall all of the events but believed that Aliza would call the police with the sole intention to frighten and intimidate him. Robert testified that Aliza would often call the police but hang up in the middle of the call and when the police did show up, there was no evidence of violence. Robert recalled the incident where he showed up with no shoes to the bowling alley and stated that he was under a lot of stress during that visit and had lost a shoe in his cab ride there, which he  realized the next day. Robert lastly testified that he was

still seeking help to learn about PKU and would make the necessary accommodations if contact with G. B. was allowed. He was not a danger to the boys, and he was ready to put in the work.

¶ 60                                        3. G.B.

¶ 61    G. B. told the trial court that even though it was a long time since he talked to his father, he still did not want to talk to him and did not miss him. G. B. feared that one day he would develop his father's violent and mean behavior, because he stated, "when you are with bad people, then you become bad." G.B. recalled his father punching his brother in the head, throwing things at him, shaking him, and screaming a lot.  G. B. stated that he feared his father and although he acknowledged some people could change, he did not believe this to be the case with his father and did not care if he did change. G. B. recalled that he had good times with his father, but also indicated that his father was unpredictable. G. B. found that his father was either really nice or really mean, and this scared him. G.B. did not want to reconnect with his father because he indicated that he had tried to on several occasions, and nothing changed. G. B. stated that if he never saw his father again, he would not care. When asked by the trial court what his first choice would be between Illinois and France, G. B. stated France despite expressing his love for his home and friends in Illinois. G. B. stated that he would feel safer in France because his father would not be there. Further, when asked if his father was not a factor, he indicated Illinois would still be hard to choose because all of his friends knew everything that had happened within his family. G. B. expressed a great deal of frustration with having to attend court dates and therapy in order to attempt to facilitate a relationship with his father. When asked by the trial court if he would attend therapy with his father, he indicated he would not and went on to state that he hated his father and that his father ruined his life. G.B. had no recollection of Robert ever doing anything for him when it came to managing his PKU.

¶ 62    Mr. Gelfman was allowed to interject and asked G. B. to recall a time when his mother drove him to Dr. Amabile's office. G. B. refused to get out of the car and when he saw his father, he ran away. Mr. Gelfman asked G. B. how he felt in that moment and G. B. responded that he was angry, mad, and scared because he did not want to see his father.

¶ 63                                    4. N. B.

¶ 64    N. B. stated that he wanted to move to France immediately because he needed to leave the Illinois and get a fresh start. N. B. stated that at Illinois events, when his father was unable to attend, people would take pictures of him and his brother and send them to his father. N. B.'s friends and other kids would tell stories about his family: he indicated that some were true, but others were not. N. B. expressed how sick he was of being defined by his last name and how every new person he would encounter knew who he was because of the family drama. N. B. believed that going to France, would give him "actual" support that he needed from family and friends, and he wanted to spend time with his grandfather. N. B. stated that he did not want a relationship with his father. N. B. explained he was emotionally exhausted from the "endless cycle" of trying to do visitations, his father losing control, and then subsequent evaluations. N. B. stated that he felt better since he was no longer forced to see his father. N. B. found his father to be unpredictable, and the times he spent with him ranged from having a great time to a scary time. N. B. stated that when he and G. B. were at his father's house, N. B. was the primary caretaker for G. B., and that scared him. N. B. stated that he did not want to reconnect with his father which entailed no more: phone calls, visits, and anything related to the court. When asked if there was any possibility for N. B. to consider reconnecting with his father, N. B. stated that it was possible but not in the near future, especially if his father gave him the space he needed. N. B. expressed his fear of entering high school in Illinois because it was a few blocks away from his father's house and in his community.

¶ 65    When asked by Mr. Gelfman if N. B. believed his father could help manage G. B.'s PKU, N. B. replied "absolutely not" because he never learned how to and did not maintain the organizational capacity to do so.  The trial court inquired if it would be okay if he or G. B. changed their mind and decided to see their father. N. B. replied that it would be okay, but he did not think that would happen. When asked by Mr. Gelfman if his mother has influenced his decision to not see his father. N. B. stated that his mother has told him that he has to decide what he wants, and it was not her decision to make; if anything, she has forced him to go to visits that he did not want to go to.

¶ 66                                    5. Mr. Gelfman

¶ 67    Mr. Gelfman was allowed to make a statement to the trial court. He stated that the boys have been through and witnessed a lot of things that they should not have. Mr. Gelfman described the boys as "sad" and "unhappy." Mr. Gelfman believed that because of their circumstance, they have matured beyond their years. He acknowledged that both parents clearly love the boys. Based on his observations and the events that have taken place he determined that in the short-term, relocating to France would benefit the boys, however, long-term the relocation would result in a lack of a relationship with their father and that they may come to regret that. Ultimately, Mr. Gelfman recommended relocation to be in the best interest of the boys so that they could have time to work through some of the trauma.

¶ 68    The trial court issued its decision on December 21, 2020, in which it decided the statutory factors under the Act weighed in favor of relocation when it found: (1) Aliza brought the petition to relocate in good faith with the best interests of the children in mind and not simply to eliminate Robert from their lives; (2) Robert's objection was done so in good faith; (3) historically, Aliza acted as the primary caregiver and had a strong relationship with the boys, whereas Robert had not

established a strong or sufficient relationship and even in the most controlled environments, contact with Robert became disruptive for the boys; (4) Aliza's plan for the boys' education was clear, even though both parents demonstrated the desire to have the boys in a good educational environment; (5) the presence of extended family in France was in the best interest of the children; (6) despite the inevitable impact that the relocation to France would have on the relationship with Robert, the move would have a significant impact on their day-to-day lives that would be beneficial to them; (7) Robert's ability to make decisions with Aliza whether jointly or long distance was impaired, Aliza always took the lead in decision-making, and Robert demonstrated he knew very little about G. B.'s PKU condition; (8) both of the boys wished to move to France and abandon the relationship with their father; (9) regardless of where the boys are located, they would not have a relationship with Robert; and (10) no additional factors were found to be relevant. The trial court granted Aliza's petition to relocate and sever joint custody. The order provided that Robert's parenting time with the minor children should continue to be restricted and there was to be no contact of any kind; it also denied Robert's motion to reinstate parenting time.

¶ 69    Robert filed a timely appeal on January 19, 2021, to which Aliza responded. Thereafter, this court granted Mr. Gelfman leave to adopt Aliza's responsive brief because he claimed that it accurately represented his position and request for this court to affirm the trial court's findings on appeal. This court also granted Aliza leave to file a sur reply brief arguing that she is not precluded from detailing facts that predate the parties' custody agreement. On October 28, 2021, we heard oral arguments and we now analyze the trial court's findings below.

¶ 70                                    II. ANALYSIS

¶ 71                            A.  Violation of Rule 341 (h)(6)

¶ 72    As a preliminary matter, Robert contends that Aliza may not argue facts that occurred prior to the entry of their August 26, 2015, custody agreement, citing *In re Custody of Farm*, 93 Ill. App. 3d 332 (1981). Robert asserts that Aliza's statement of facts in her response brief is in violation of supreme court Rule 341(h)(6) (Ill. S. Ct. R 341(h)(6) (eff. Oct. 1, 2020)) by not including the facts necessary to the understanding of the case. Robert maintains that, instead, Aliza's statement of facts is prejudicial, inflammatory, self-serving, lacking details of certain events, and factually inaccurate.

¶ 73    Aliza contends that Robert is estopped from claiming that she is unable to argue facts that predate their custody agreement because the parties agreed to the scope of proceedings prior to the trial on the petition to relocate citing *In re Marriage of Reidy*, 2018 IL App (2d) 170054, as support. Further, Aliza contends that the trial court was not precluded from considering evidence that predated the custody agreement because, pursuant to *Farm*, she was required to establish a change of circumstance in order to justify modification of the parenting agreement. *Id.* Aliza asserts that the only restriction that was granted, was a motion *in limine* to bar Aliza's exhibits that did not have a certified translation.

¶ 74    We do not find Aliza to be precluded from detailing facts prior to the entry of August 26, 2015, custody agreement. Robert's claim on appeal that Aliza's appellee brief must identify a changed condition in order to modify an existing judgment is misplaced. *Farm*, detailed the requirements necessary for making a change in custody. *Id*. at 334. However, Aliza is not seeking a changed condition to the trial court's judgment, she is seeking to have this court affirm it. Although at trial, Aliza was seeking a permanent change in custody to sever the joint parenting agreement, this case has no bearing on the requirements of an appellee's brief on direct review when the trial court considered the very facts that are seeking to be excluded.

¶ 75    Next, we must determine if Robert is estopped from seeking preclusion of the facts prior to the custody agreement. This court has held, "a party cannot complain of an error that he either induced the court to make or to which he consented." *Reidy*, 2018 IL App (2d) 170054, ¶ 29. Our review of the record shows that at trial, Robert went into great detail about many facts that predated the custody agreement. Clearly, Robert consented to the trial court reviewing facts that predate the 2015 custody agreement. *Id.* Given this, we find that Robert is estopped from raising this issue on appeal. *Id.*

¶ 76    Likewise, we do not find the other aspects of Aliza's brief to be in violation of supreme court Rule 341(h)(6), which requires:

> "(6) Statement of Facts, which shall contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment, and with appropriate reference to the pages of the record on appeal in the format as set forth in the Standards and Requirements for Electronic Filing the Record on Appeal." Ill. S. Ct. R 341(h)(6) (eff. Oct. 1, 2020).

Aliza's statement of facts are extremely descriptive and included a photo which is not normally done in these proceedings. We do not find the facts to be overly prejudicial, inflammatory, self-serving, nor do we find them be factually inadequate because the brief does not interfere with our understanding of the case at hand. *Venturella v. Dreyfuss*, 2017 IL App (1st) 160565, ¶ 21. We do not find Aliza's response brief to be in violation of Rule 341(h)(6) (Ill. S. Ct. R 341(h)(6) (eff. Oct. 1, 2020)) and therefore decline to strike the responsive brief.

¶ 77                                    B. Trial Court's Findings

¶ 78    On appeal, Robert contends that: (1) the decision to grant relocation was against the manifest weight of the evidence and (2) the trial court erred in ordering that he have "no contact

of any kind." He contends that the trial court's December 21, 2020, order was manifestly against the evidence and unjust when it permitted the relocation of the boys pursuant to 750 ILCS 5/609.2(g) (West 2018) of the Act.

¶ 79                               C. Standard of Review

¶ 80    In adjudicating a relocation petition filed under section 609.2(g) of the Act (750 ILCS 5/609.2 (g) (West 2018)), the principal consideration is the best interests of the children. *In re Marriage of Fatkin*, 2019 IL 123602, ¶ 32. Our supreme court has explained that a best-interests analysis "cannot be reduced to a simple bright-line test" and that when ruling on the best interests of a child it "must be made on a case-by-case basis," depending mainly on the circumstances of each case. *Id.* Due to the case-by-case nature, "the result cannot be reduced to a simple tally of which party 'won' a majority of the enumerated factors; instead, because some factors in a particular case may weigh more heavily than others, the trial court must consider all factors and evidence touching on the issue and must arrive at a reasonable result." *In re Marriage of Levites,* 2012 IL App (2d) 200552, ¶ 71.

¶ 81    This court should not reverse the trial court's best interest determination "unless it is clearly against the manifest weight of the evidence, and it appears that a manifest injustice has occurred." *Fatkin*, 2019 IL 123602, ¶ 32. A trial court's decision is against the manifest weight of the evidence "only if the evidence 'clearly' calls for a conclusion opposite to that reached by the trial court or only if the factual findings on which the decision depends are clearly, plainly, and indisputably erroneous." *In re Parentage of P. D.*, 2017 IL App (2d) 170355, ¶ 18. This standard is preferred because it recognizes that the trial court is in the best position to observe all parties in order to "assess and evaluate their temperaments, personalities, and capabilities." *Fatkin*, 2019 IL 123602,

¶ 32. Consequently, there is a presumption that is "in favor of the result reached by the trial court," which is always strong and compelling in this type of case. *Id*.

¶ 82                                   D. Statutory Factors

¶ 83    The parent requesting relocation must file a petition seeking court approval and bears "the burden of proving that the relocation is in the best interests of the child, as measured by the factors set forth in section 609.2(g)." *Levites,* 2012 IL App (2d) 200552, ¶ 57.

¶ 84     The statutory factors outlined in section 609.2(g) are as follows:

"(1) the circumstances and reasons for the intended relocation;

(2) the reasons, if any, why a parent is objecting to the intended relocation;

(3) the history and quality of each parent's relationship with the child and specifically whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him or her under the parenting plan or allocation judgment;

(4) the educational opportunities for the child at the existing location and at the proposed new location;

(5) the presence or absence of extended family at the existing location and at the proposed new location;

(6) the anticipated impact of the relocation on the child;

(7) whether the court will be able to fashion a reasonable allocation of parental responsibilities between all parents if the relocation occurs;

(8) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to relocation;

(9) possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the child;

(10) minimization of the impairment to a parent-child relationship caused by a parent's relocation; and

(11) any other relevant factors bearing on the child's best interests." 750 ILCS 5/609.2(g) (West 2018).

We will review each of these factors in turn.

¶ 85                    1. Circumstances and Reasons for Relocation

¶ 86    Robert contends that the trial court erred when it found that the circumstances and reasons for the relocation were done in good faith because it went against the recommendations of Dr. Amabile and Dr. Kraus. Robert asserts that the trial court's findings that Aliza was motivated to protect the boys from harm was incorrect as evidenced by Dr. Amabile who reported that the boys enjoyed being with their father. Aliza, however, contends that the circumstances and reasons for relocation began before and continued after the parties were divorced, which demonstrates that her reasons for relocation were rooted in good faith.

¶ 87    The trial court found that this factor weighed in favor of relocation. The trial court observed that the decision to relocate was done out of Aliza's deep desire to protect the boys from continued emotional turmoil, in good faith, and not done in furtherance of some evil plot to take the boys away from Robert. Given our review of the record, we cannot say that the trial court's decision was clearly against the manifest weight of the evidence. *Fatkin*, 2019 IL 123602, ¶ 32.

¶ 88    At trial, Aliza and the boys recalled numerous incidents of Robert's behavior causing the boys  a great deal of stress and stigma. Aliza detailed the supportive community that they would have in France, whereas, in Illinois, there would be no substantial support even if Robert had every intention to be there for them. Although Robert acknowledged the issues, he consistently minimized the effect on the boys, promised to work on it more, and blamed Aliza despite the

impassioned pleas of the boys.  Even though Dr. Amabile and Dr. Kraus did not recommend relocation, they made it clear that Aliza should remain the decision-maker for the boys. Further, Mr. Gelfman did recommend relocation despite the potential damage it could cause to Robert's relationship with the boys. We find that the trial court's determination with regard to this factor is supported by the record and did not constitute manifest error. *Id*.

¶ 89                                     2. Reasons Why a Parent is Objecting

¶ 90     Both parties agree with the trial court that Robert's objections are done so in good faith. However, Aliza cautions that Robert's objections are unrealistic given the family's situation.

¶ 91     At trial, Robert testified to the fond memories he had of raising the boys early on. The evidence showed that Robert is willing to go to therapy to work on himself and his parenting skills. We too believe that Robert's objections were made in good faith and find that the trial court's assessment of this factor is not clearly against the manifest weight of the evidence. *Id.*

¶ 92     3. History and Quality of Each Parent's Relationship and Whether a Parent Has Substantially Failed to Exercise the Parental Responsibilities Allocated

¶ 93     Robert contends that the trial court erred in finding that he did not establish a significant or strong relationship with the boys because he had a strong relationship with them until it was undermined by Aliza. Robert asserts that the unnatural nature of supervised visitations and the ultimate suspension of parenting time put a further strain on their relationship.

¶ 94     Aliza contends, however, that the relationship Robert had with the boys "did not happen in a vacuum" and recalls several incidents before the supervised visits where Robert neglected his children. Aliza asserts that at no time did Robert ever assist with G. B.'s PKU. When the visits became more restricted, Aliza alleges that Robert was late and did not adhere to the supervisor's

scheduling needs, and neglected to pay the supervisor. In contrast, Aliza contends that she has always maintained a "constant, steady, and positive presence" in the lives of the boys.

¶ 95    The trial court found that this factor weighed in favor of relocation because Aliza has acted as the boys' primary caregiver and has always maintained a strong relationship with them. Given our review of the record, we cannot say that the trial court's decision was clearly against the manifest weight of the evidence. *Fatkin*, 2019 IL 123602, ¶ 32.  Robert testified to caring for the boys early on in their lives. As the boys grew older, Robert continued to be a part of their lives and Robert continued to have stories to tell of them enjoying their time together. However, as many stories as Robert recounts about the laughter that they shared, the boys and Aliza have a counter story of how the laughter turned into shouting, or worse. Additionally, Robert has acknowledged that he overwhelmingly deferred to Aliza on all aspects of parenting decisions. Even though there was a parenting plan that gave him joint custody prior to 2017, Robert did not exercise his parenting responsibilities allocated to him. We find that based on the record, there was evidence supporting the trial court's conclusion. *Levites, 2012 IL App (2d) 200552, ¶ 74.*

¶ 96                    4. Educational Opportunities for the Child

¶ 97    Robert contends that the trial court's decision was manifestly against the evidence when it permitted the relocation of the boys because of the educational opportunities at the existing location are superior in comparison to the proposed location. Robert asserts that the proposed school in France, École Yabné, is not as highly ranked as the school they would go to in Illinois, which is the  Ida Crown Jewish Academy. Robert maintains that this decision further ignored the evidence presented at trial demonstrating the antisemitic bigotry and harassment that French Jews experience today, which is not as prevalent in Illinois. Aliza acknowledges that antisemitic acts are more prevalent in France, however, she contends that Robert does not fully address the

educational opportunities in both cities. Aliza maintains that education in France is cheaper, and the proposed school is the largest and ranks among the best in France.

¶ 98    The trial court found that Aliza had a clear plan for education in France. Given our review of the record, we cannot say that the trial court's decision was clearly against the manifest weight of the evidence. *Fatkin*, 2019 IL 123602, ¶ 32. At trial, Robert testified that the Ida Crown Jewish Academy was near him and was an exceptional school. This proximity was something that gave N. B. anxiety as the time grew closer to him having to attend because his father and the community, which would have added additional stress. The two proposed schools within each respective city do not appear to be lacking in educational opportunities for the boys. However, the school in the existing location clearly posed a threat to N. B.'s mental wellbeing. Thus, we cannot find the trial courts determination to be manifestly against the evidence. *Id*.

¶ 99        5. Presence or Absence of Extended Family in Illinois and France

¶ 100   Robert contends that the trial court's decision was "shortsighted" when it permitted the relocation of the boys because, although neither party has extended family in the Illinois, he still has his sister in Philadelphia. Robert asserts that the tight-knit community of other Orthodox Jews, is also considered their extended family, and relocating his sons would take them away from this family. Robert contends that the move would be the end of any relationship with their paternal side of the family. Aliza contends that Robert cannot equate the Orthodox Jewish community in Illinois to extended family. Further, Aliza asserts that it is this community that has caused her children distress. Aliza contends that France is the only meaningful option that has access to an extended family for the boys.

¶ 101   The trial court determined that this factor favored relocation because of the presence of extended family in France. Given our review of the record, we cannot say that the trial court's

decision was clearly against the manifest weight of the evidence. *Fatkin*, 2019 IL 123602, ¶ 32. At trial, neither party testified to having any family in Illinois. Even considering Robert's sister in Philadelphia, the extended family and friends in France greatly outnumber this. Aliza testified that her family and friends would be a great support system for her and the boys. Although Robert argues that this will limit the relationship with his sister, the boys have had a limited relationship with their maternal side because of the distance for their entire lives, this absence must count as well. Lastly, even if this court were to consider the community of Orthodox Jews in Illinois to be the extended family of the boys, the evidence produced at trial demonstrated that this community caused the boys a great deal of pain instead of support. We find that based on the record, there was evidence supporting the trial court's conclusion. *Levites, 2012 IL App (2d) 200552, ¶* 74.

¶ 102                    6. Anticipated Impact of the Relocation on the Children

¶ 103   Robert contends that the trial court's decision was manifestly against the evidence when it permitted the relocation of the boys because it was contrary to the explicit recommendations of Dr. Amabile, Dr. Kraus, and Mr. Gelfman. Robert asserts that both Dr. Amabile and Dr. Kraus were against relocating and recommended more therapy. Robert asserts that the trial court ignored the opinion of Mr. Gelfman who stated that relocating to France would be great for the boys in the short-term, but in the long-term there would probably be no relationship with the father, or even the ability to work on one. Aliza contends that the boys have been subjected to an unthinkable amount of scrutiny already and they need a break.

¶ 104   The trial court found that this factor favored relocation because it would benefit the boys despite the impact on their relationship with their father. Given our review of the record, we cannot say that the trial court's decision was clearly against the manifest weight of the evidence. *Fatkin*, 2019 IL 123602, ¶ 32. The report submitted by Dr. Amabile did recommend additional therapy

and sought that the court appoint Dr. Grossman to conduct reunification therapy. Dr. Grossman submitted a report that detailed how the boys were vehemently against reconnecting with Robert. Dr. Grossman recommended that maybe therapy could happen in the future but would not suggest it for them at the moment. In fact, Dr. Grossman cautioned against forcing the boys to participate in such therapy given their resistance because it would not be beneficial. Dr. Kraus recommended not only more therapy for the boys, but therapy to get Aliza to make the boys participate. Mr. Gelfman recommended relocation and joined Aliza in her brief on appeal. The recommendations tendered to the trial court did not clearly disfavor relocation. Based thereon, we cannot say the trial courts assessment was against the manifest weight of the evidence. *Id.*

¶ 105       7. Reasonable Allocation of Parental Responsibilities Between All Parents

¶ 106   Robert contends that the trial court's determination was insufficient because it did not explain what reasonable allocation of parenting responsibilities might be employed or whether if it were possible. Aliza contends that if the boys are in France or Illinois, there would be no reasonable allocation of parental responsibilities because Robert is not able to handle parental responsibilities.

¶ 107   The trial court found that this factor favored relocation because Aliza has always been the primary caretaker of the boys and Robert always followed her lead. The trial court determined it did not matter if Aliza were in Illinois or France, Robert's ability to make decisions was impaired. Given our review of the record, we cannot say that the trial court's decision was clearly against the manifest weight of the evidence. *Fatkin*, 2019 IL 123602, ¶ 32. At trial, the evidence showed a lack of co-parenting demonstrated by the parties and the recommendation that Aliza remain the decision-maker was echoed by both reports of Dr. Amabile and Dr. Kraus. At trial, Aliza testified that not only was she the primary decision-maker for the boys, but she also assisted Robert on a

daily basis with his own basic needs. We find that based on the record, there was sufficient evidence supporting the trial court's conclusion. *Levites,* 2012 IL App (2d) 200552, ¶ 74.

¶ 108                                8. Wishes of the Child

¶ 109   Robert contends that the trial court's decision was contrary to the evidence when it permitted the relocation of his sons because it attributed maturity and decisiveness that both of the boys lacked. Robert contends that on previous occasions the boys stated they did not wish to go to France. Robert asserts that this change is attributable to Aliza's manipulation of them. Aliza contends that the trial court heard the wishes of both of the boys and those wishes indicated that they wanted to go to France.

¶ 110   The trial court found that this factor favored relocation when both of the boys stated that they wanted to move to France during the *in camera* interviews. Given our review of the record, we cannot say that the trial court's decision was clearly against the manifest weight of the evidence. *Fatkin*, 2019 IL 123602, ¶ 32. The trial court posed questions and scenarios to each of the boys to see what if any condition would be acceptable for them to see their father. N. B. indicated that nothing but time apart would get him to want to see his father. While G. B. indicated that he did not care to see his father ever again. When asked to eliminate Robert from being included as a factor in staying in Illinois, G. B. responded that even without Robert, the community still remained, and that was still enough of a reasons to leave. At no point in the interviews did the boys indicate that they wished to remain in Illinois. We find that based on the record, there was evidence supporting the trial court's conclusion. *Levites,* 2012 IL App (2d) 200552, ¶ 74.

¶ 111          9. Possible Arrangements for the Exercise of Parental Responsibilities

¶ 112   Robert does not contest the findings of the trial court when it determined that this factor goes against relocation. Aliza contends that this factor has no real impact given the parenting

restrictions that Robert currently has. The trial court noted that relocation would further limit Roberts parenting time even though it was already restricted, and the distance was significant. Given our review of the record, we cannot say that the trial court's decision was clearly against the manifest weight of the evidence. *Fatkin*, 2019 IL 123602, ¶ 32. At trial, it was clear that when Robert had parenting time, both of the boys even resisted the limited schedule. Relocation would limit Robert's parenting time even further. Accordingly, we find that, there was evidence supporting the trial court's conclusion. *Levites,* 2012 IL App (2d) 200552*, ¶* 81.

¶ 113    10. Minimization to the Impairment to a Parent-Child Relationship

¶ 114 Robert contends that the trial court's decision was manifestly against the evidence and unjust when it found that the relocation of the boys was neutral: not weighing for or against relocation. Robert asserts that he does not have a relationship with the boys because the trial court was actively preventing that from happening. Aliza contends that the best way to minimize additional impairment is to give the boys some space. Aliza asserts that the trial court should have found this factor to point toward relocation instead of being neutral.

¶ 115 The trial court specifically determined that regardless of their location, the boys would not have a relationship with their father. Given our review of the record, we cannot say that the trial court's decision was clearly against the manifest weight of the evidence. *Fatkin*, 2019 IL 123602, ¶ 32. At trial, reports from Dr. Grossman and Dr. Kraus indicated that the boys refused a relationship with Robert. Dr. Grossman indicated that space might help the relationship between Robert and the boys. While Mr. Gelfman cautioned that while the time apart might be irreparable, it was necessary for the well-being of the boys. The determination of this factor being neutral appears reasonable given that the trial court was tasked with weighing the evidence and

conclusions that were at times in opposition. *Levites,* 2012 IL App (2d) 200552*, ¶* 91. Hence, we find that the evidence supported the trial court's conclusion. *Id. ¶* 74.

¶ 116    The trial court was in the best position to observe, assess, and evaluate the witnesses as the evidence was presented. As detailed above, each of the trial court's findings on the relevant factors were supported by evidence presented at trial. Thus, we find that the trial court's best-interests determination was not clearly against the manifest weight of the evidence. *Id.*

¶ 117                                          B. No Contact of Any Kind

¶ 118    Robert contends that the trial court's no contact order is in violation of the two-step process for restricting parenting time pursuant to the serious-endangerment standard citing *In re Marriage of Mayes*, 2018 IL App (4th) 180149, ¶ 56. For the first-step, Robert asserts that because the trial court used the same basis for determining the ten relocation factors as it did the no contact order, he re-incorporates the arguments he made in his first claim, that the findings and rulings were against the manifest weight of the evidence and manifestly unjust. For the second-step, Robert asserts that the trial court abused its discretion in restricting his parenting time and responsibilities in the way that it did. Robert maintains that the trial court ignored all recommendations of Dr. Amabile, Dr. Kraus, and Mr. Gelfman and ignored his petition, but yet blamed Robert for the estrangement. Robert contends that the order went beyond even what Aliza wanted, who appeared to provide for contact between he and the boys in her relocation motion.

¶ 119    Aliza contends that the trial court made the right decision given Robert's previous violent and negligent behavior. Aliza asserts that the boys are at their best when Robert is not in contact with them, so it is fitting that he is restricted in contacting them.

¶ 120    Section 603.10 (750 ILCS 5/603.10 (West 2018) of the Act requires a two-step process for a trial court to restrict parental responsibilities. *Mayes*, 2018 IL App (4th) 180149, ¶ 58. First, the

trial court must make a factual determination that the preponderance of the evidence shows the parent has "engaged in any conduct that seriously endangered the child's mental, moral, or physical health or that significantly impaired the child's emotional development." 750 ILCS 5/603.10(a) (West 2018). If the trial court does this, they must enter orders "as necessary to protect the child." *Id.* The trial court "must exercise its discretion in selecting appropriate restrictions to parenting responsibilities to provide for the child's safety and welfare." *Mayes*, 2018 IL App (4th) 180149, ¶ 58. "A court's factual determination will be found to be against the manifest weight of the evidence if, upon review of the entire record, the opposite conclusion is clearly evident." *Id*. at ¶ 59.

¶ 121   Here, the evidence at trial showed a man who cared about the boys and wanted to be involved in their lives. However, the evidence also demonstrated that Robert blamed someone else for every shortcoming that he had regarding the boys. Most concerning, the trial court found that Robert also blamed Aliza for his limited knowledge about his son's PKU, which if mismanaged could result in severe medical complications for G. B.

¶ 122   Additionally, the evidence at trial showed that Robert was prone to violent rages. Although the vast majority of these rages were directed toward inanimate objects, there were occasions when the rages were directed toward family members. The boys both described spending time with their father as unpredictable and going from one extreme to another. Aliza testified that exposure to Robert has had severe emotional consequences for the boys which only gets better when they are not in contact with him. Although Robert continued to minimize his behavior by stating that DCFS found that there was no abuse, he nonetheless admitted to physically attacking N. B. Thus, the trial court's finding that Robert's conduct continued to seriously endanger the minor children's mental,

moral, and physical health, and significantly impaired the minor children's emotional development was not against the manifest weight of the evidence. *Mayes*, 2018 IL App (4th) 180149, ¶ 58.

¶ 123   In making this determination, the trial court was required to enter orders necessary to protect the boys by selecting the appropriate restrictions for their safety and welfare. *Id*. at ¶ 61. This restriction would not be reversed on appeal absent an abuse of discretion. *Id*. An abuse of discretion occurs when the position taken by the trial court would not be adopted by a reasonable person. *Id*.

¶ 124   The trial court ordered that Robert have no contact of any kind unless it was by agreement of the parties or court order. Although termination of parenting time seems extreme, at trial, Aliza testified that contact with Robert made both of the boys develop traumatic responses that included N. B. becoming suicidal. Without the contact, the boys showed signs of improvement. Further, the boys went into great detail about how uncomfortable their lives had been in Illinois because of their father. Consequently, we find the restriction of no contact necessary for the safety and welfare of the boys, and thus the decision is not a result of an abuse of discretion. *Id*.

¶ 125   Lastly, during oral argument, counsel for Robert described the trial court's no contact order as amounting to a termination of his parental rights. However, section 603.10(b) (750 ILCS 5/603.10(b)) (West 2018) allows for a modification of parenting time at any time, upon a showing of changed circumstances and to serve the best interest of the child, without a showing of serious endangerment. Therefore, we find that the order is not permanent in nature and therefore is not tantamount to a termination of Robert's parental rights.

¶ 126                            III. CONCLUSION

¶ 127   For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 128   Affirmed.

¶ 129   JUSTICE HARRIS, dissenting:

¶ 130   The trial court's careful consideration of this difficult case merits recognition. However, I cannot agree that the evidence supports the court's decision to grant Aliza's petition to relocate to France, or the court's order of no contact between Robert and his sons.

¶ 131   This case presents a unique situation where relocation would, in effect, terminate Robert's parental rights. According to Dr. Amabile, Dr. Kraus, and Mr. Gelfman, Aliza's relocation to France with N.B. and G.B. would end their relationship with their father. Dr. Amabile opined that "[i]f the relocation to France were to happen in the context of this severe strain between Mr. Barsky and his sons, it would mean the likely termination of the father/son relationships." Dr. Kraus concluded that "the children will have no chance for any type of relationship with the father if they move to Paris." He further noted that "there has been no Reintegration Therapy ever put into place to assist with Mr. Barsky's relationship with the children." He strongly recommended that "at the present time, the children not be allowed to be removed to Paris." Mr. Gelfman, the children's representative, acknowledged that in the short term, removal to Paris "would be a great thing for them. But in the long-term, there probably would be no relationship between their father or the ability to work on that relationship. I think there will be a lot of regret there." Dr. Amabile and Dr. Kraus therefore recommended that the children not relocate to France.

¶ 132   Despite the opinions of Drs. Amabile and Kraus to the contrary, the court granted Aliza's petition to relocate knowing that doing so would "hinder contact for Robert with his sons," and knowing that the doctors advised against relocation because it would sever the father/son relationship. Even the children's representative acknowledged that the move to France would result in Robert having no relationship with his sons. Given the court's concurrent no contact order, this outcome is all the more certain to occur.

¶ 133   I also believe that the court's decision to enter a no contact order was not supported by the evidence. The majority admits that the no contact order "seems extreme." The law recognizes that children have an interest in maintaining contact with both parents following a divorce, and this interest should be noted when determining whether a parent should relocate. *In re Marriage of Eckert*, 119 Ill. 2d 316, 325 (1988). Drs. Amabile and Kraus were well-aware of everything that occurred between Robert and his sons, and N.B.'s and G.B.'s feelings about their father. And yet, they did not recommend Robert should have no contact with them. They instead advocated for therapy to repair the damaged relationship. Mr. Gelfman conditioned his opinion that Aliza be allowed to relocate on Robert maintaining contact with his sons. Aliza's relocation petition even provided for contact between Robert and his sons.

¶ 134   By granting Aliza's petition to relocate to France, and ordering that Robert have no contact of any kind with his children unless by agreement of the parties or permission of the court, the trial court essentially terminated Robert's parental relationship with N.B. and G.B. without evidence that such termination was in the best interests of the children. I do not suggest that the court came to this decision lightly, as the court clearly struggled with it. However, for the reasons stated I cannot agree with the court's determination. Therefore, I respectfully dissent.